REGINA M. GIARDINA AND PETER GIARDINA, CO-ADMINIS-
TRATORS AD PROSEQUENDUM FOR THE ESTATE OF JOHN
GIARDINA, PLAINTIFFS–APPELLANTS, v. GARDINER C.
BENNETT, M.D., DEFENDANT–RESPONDENT, AND JOHN
DOE, JAMES DOE AND XYZ CORPORATION, FICTITIOUS
NAMES INTENDED TO DESIGNATE UNKNOWN INDIVIDU-
ALS AND ENTITIES, DEFENDANTS.

Argued May 2, 1988—Decided August 10, 1988.

*Richard M. Chisholm* argued the cause for appellants (*Sellar, Richardson, Stuart & Chisholm,* attorneys; *Richard M. Chisholm* and *Joseph P. Vesey, Jr.,* on the briefs).

*Hugh P. Francis* argued the cause for respondent (*Francis & Berry,* attorneys; *Evelyn C. Farkas,* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

In this case, we deal with the claim of a distraught wife and husband, who contend that their baby was stillborn as a result of the negligence of their obstetrician. The far-reaching question posed by this claim is how our tort system should respond to the negligently caused death of a fetus. The immediate question that is presented is whether this claim gives rise to a statutory right of recovery under the state's Wrongful Death Act. We conclude that the medical malpractice causing an infant stillbirth constitutes a tort against the parents, entailing the direct infliction of injury, their emotional distress and mental suffering, for which they are entitled to recover compensatory damages.

By recognizing such a cause of action we protect the interests affected by the tortious conduct resulting in the death of an infant before birth. Similar concerns are also implicated in the statutory right of action provided by the Wrongful Death Act, under which the parents in this case seek to recover. We conclude, however, that the Wrongful Death Act does not permit recovery attributable to the wrongful death of an infant before birth.

I.

This appeal is from the grant of summary judgment. According to the record as it is presented to us, reflecting plaintiff's version of the facts in the absence of a full adjudication, in October 1982, Regina Giardina was informed by the defendant, Gardiner Bennett, her obstetrician and gynecologist, that she was pregnant and that her due date was May 19, 1983. During the course of her pregnancy Giardina was regularly examined by defendant and his staff. When she was nearly two weeks overdue, he ordered a "non-stress test," and after its performance on June 3, 1983, Giardina was told that no problems had been revealed.

Over the course of the next nine days Giardina experienced intermittent pain and contractions, visited the hospital twice, and was examined by defendant twice. Bennett considered her symptoms common and allegedly refused to perform a Caesarean section. Late on the evening of June 12, 1983, when Giardina's contractions were three minutes apart, defendant instructed her to proceed to the hospital. Shortly after her admission, hospital staff became aware that no fetal heartbeat could be identified, and defendant later confirmed the baby was dead. Giardina was given a drug to induce labor, and the baby was stillborn the next afternoon, June 13, 1983.

The Giardinas contend defendant's treatment deviated from accepted standards of medical care. On June 11, 1985, they filed a complaint as co-administrators ad prosequendum for the infant's estate seeking compensatory damages against Bennett and unknown defendants, and damages for the infant's "conscious pain and suffering" prior to death. No claims on behalf of the Giardinas themselves were asserted for any personal injuries.

It was clarified in the course of the proceedings that the complaint was brought under the Wrongful Death Act. *See* *N.J.S.A.* 2A:31-2. The complaint was thus presented as a direct challenge to this Court's decision in *Graf v. Taggart*, 43

*N.J.* 303 (1964), in which we ruled that, due to the "uniformly speculative" nature of damages, a wrongful death action could not be maintained with respect to the pre-birth death of an infant. On June 6, 1986, defendant Bennett was granted summary judgment and plaintiffs appealed to the Appellate Division. On the appeal the parties presented the sole issue to be the applicability of the Wrongful Death Act to the death of a fetus. The Appellate Division summarily affirmed. Plaintiffs' petition for certification was then granted. 109 *N.J.* 490 (1987).

## II.

The plaintiffs, as noted, have brought suit under the Wrongful Death Act, *N.J.S.A.* 2A:31-1 to -6, seeking to recover damages attributable to the death of their infant before its birth. The cause of action they assert entails an interpretation of the Act that has thus far not been adopted by our courts. The novelty of the claim impels us to examine the nature of the injury arising from the wrongful conduct and to consider whether as a matter of common-law doctrine, and under the Wrongful Death Act, plaintiffs have presented a legal claim for compensatory damages.

Medical malpractice causing a stillbirth results in infliction of a direct injury to the mother as well as to her unborn child. Even without any permanent physical harm, the mother suffers severe and genuine injuries in the form of emotional distress and mental anguish occasioned by her baby's stillbirth. This suffering is experienced, also, by the father of the infant. Thus, in a case such as this, the injury suffered by the mother and father on the stillbirth of their eagerly expected first child is palpable and predictable.

The essence of the injuries that arise from this kind of tort inheres in family relationships. In *Berman v. Allen,* 80 *N.J.* 421 (1979), this Court recognized the significance of tight family ties. In sustaining a parents' cause of action for the deprivation of a choice to terminate a pregnancy, the Court allowed

recovery for their emotional distress resulting from their child being born with a congenital defect. The Court held that the parents had a cause of action for emotional distress against their doctor who, by failing to inform them of the availability of amniocentesis, through which they could have discovered the genetic abnormality of the fetus, deprived them of the opportunity to terminate the pregnancy and avoid the birth of the child. *Id.* at 433–34. The Court concluded that the emotional distress itself was a compensable injury and was an appropriate measure of compensatory damages. The parents, said the Court, "are entitled to be recompensed for the mental and emotional anguish they have suffered and will continue to suffer on account of [their child's] condition." *Id.* at 434.

The Court thus recognized in *Berman* that the shock and bitterness of parents in having been deprived of any choice concerning the birth of their child provided a basis for emotional distress damages. This was echoed in *Schroeder v. Perkel,* 87 *N.J.* 53 (1981). In that case, the doctors' malpractice consisted of negligent genetic counselling. The doctors had assured the parents that their first child did not have cystic fibrosis, when in fact she did. A second child was conceived and, following its birth, was found to suffer from the same genetic disorder. *Id.* at 66. We determined that the negligent failure to inform the parents of the genetic risk deprived them of the opportunity intelligently to consider the wisdom or desirability of having another child. Justice Pollock, speaking for the Court, observed:

> The foreseeability of injury to members of a family other than one immediately injured by the wrongdoing of another must be viewed in light of the legal relationships among family members. A family is woven of the fibers of life; if one strand is damaged, the whole structure may suffer. The filaments of family life, although individually spun, create a web of interconnected interests. [*Id.* at 63–64.]

Consistent with the holding in *Berman, supra,* 80 *N.J.* 421, the Court permitted compensatory damages for the parents' emotional distress attendant on the birth of their second child, who was tragically but predictably afflicted with cystic fibrosis.

The Court also ruled that the parents could recover for the extraordinary medical costs of raising a child with cystic fibrosis. These damages, the emotional distress and extraordinary medical expenses, were clearly foreseeable consequences of defendant's negligent conduct. *Schroeder, supra,* 87 *N.J.* at 63.

In *Procanik v. Cillo,* 97 *N.J.* 339 (1984), the Court again acknowledged a family tort. It recognized that a tort committed against the mother and her unborn child was a tort against the immediate family unit. The doctors there negligently interpreted a German measles test and, ignorant of the true condition of their unborn child, the parents were denied any opportunity to consider terminating the pregnancy. Tragically, the child was born with profound handicaps that required extraordinary medical care and expenses. The Court, noting that the parents' claim for emotional distress was time-barred, held that, because the tort affects the family, the child could state a cause of action limited to the special damages for medical care; recovery "should not depend on the wholly fortuitous circumstances of whether the parents are available to sue." *Id.* at 352 (quoting *Turpin v. Sortini,* 31 *Cal.*3d 220, 328, 643 *P.*2d 954, 965, 182 *Cal.Rptr.* 337, 348 (1982)).

These cases inform our understanding of the rights and duties of the parties in this appeal. The forms of genetic-counselling malpractice that occurred in these cases are similar to the malpractice alleged in this case. The malpractice is directed against expectant parents and the unborn child. The gravity of such negligence, the foreseeability of parental suffering, and the genuineness of injury and loss, all of which inhere in a birth attended by tragedy, present a compelling case for recognition of the direct injury to the parents. In a case such as this, the defendant's alleged malpractice results in serious and devastating loss to the parents, the death of their eagerly expected healthy baby, and, predictably, engenders emotional distress and mental anguish. The congenital defects of the children in *Berman* and *Schroeder* obviously contributed to the emotional

distress of the parents occasioned by the deprivation of their right to make a choice. The emotional distress suffered by the parents in a case such as this, the shocking experience of their healthy infant's stillbirth, is similarly severe. Moreover, in *Schroeder, Berman,* and *Procanik,* the congenital defects of the gravely impaired newborns were not actually caused by the defendants. By contrast, in this kind of case, the stillbirth of what had been a normally developed fetus was caused directly by defendant's alleged negligence.

We recognized in these genetic counselling malpractice cases that the malpractice eventuating in the tragic births had a direct and foreseeable impact on the family as a unit. This was a reflection of the strong and intimate bonds between the respective parents and their child. The relationships in this case are not different and the expectations of the parents are not distinguishable. Consequently, the parental and family interests, and the duty to protect those interests, are the same. We thus conclude that the wrong committed by a doctor in negligently causing the pre-birth death of an infant constitutes a tort against the parents.

This Court has also recognized in other contexts an independent cause of action for the negligent infliction of emotional distress arising from wrongful conduct directed against intimate members of a claimant's family. In *Portee v. Jaffee,* 84 *N.J.* 88 (1980), the plaintiff was a mother who had watched her seven-year-old son suffer and die over a four-hour period while he was trapped between an elevator door and elevator shaft. The family relationship was of utmost significance. The Court held that the mother could recover for her emotional injury without accompanying physical harm or fear of physical harm. *Id.* at 95–96. In addition to "the death or serious physical injury of another that is caused by defendant's negligence," the actual "observation of the death or injury at the scene of the accident," and the "resulting severe emotional distress," the Court stressed the "marital or intimate familial relationship between plaintiff and the injured person." *Ibid.*

A critical element in this spectrum of cases is the intimate family relationship between the claimant and the immediate victim. It is this relationship that serves as the factual and legal basis for determining whether a duty of reasonable care is owed to the claimant. Thus, the fairness in imposing such a duty, the legitimacy of such a claim brought by a family member, and the genuineness of the ensuing emotional distress, all spring from and depend on the strength of family ties between the claimant and the victim. As the Court observed in *Portee v. Jaffee, supra,* 84 *N.J.* at 97, "the interest assertedly injured is more than a general interest in emotional tranquility. It is the profound and abiding sentiment of parental love." *See Friel v. Vineland Obstetrical & Gynecological Ass'n.,* 166 *N.J.Super.* 579, 587–92 (Law Div.1979) (mother of a child born prematurely due to defendant doctor's negligence could recover for the uncertainty and anxiety associated with the genuine medical fear that the child's development was adversely affected by its prematurity); *see also Strachan v. John F. Kennedy Memorial Hosp.,* 109 *N.J.* 523, 534 (1988) (the anguish that the parents were made to suffer over three day period while wrongfully forced continuously to see their dead son "lying in bed, with tubes in his body, his eyes taped shut, and foam in his mouth" was actionable).

In a case such as this, it would appear that the parents could establish that they suffered genuine and severe emotional distress proximately caused by the negligent treatment of the mother and her unborn child, resulting in the stillbirth of the child. This case thus presents an amalgam of several elements of our decisional law. As in *Berman–Schroder–Procanik,* the duty of care owned to a pregnant woman is owed as well to her unborn child and the expectant father; professional negligence eventuating in a tragic birth involves a tort that resounds against the immediate family unit. These considerations ensure the fairness in recognizing and protecting such family interests. These factors are reiterated in *Portee,* and, in this case, the experience of pregnancy and child birth itself consti-

tutes the immediacy and presence of the claimant in the face of inflicted personal injury or death of a loved one that was stressed in *Portee.* These circumstances assure the genuineness of the resulting emotional injury and mental anguish. Further, as exemplified in these cases, and in *Friel* and *Strachan,* the predictability and severity of the emotional distress and mental anguish arising from parent-child love in the face of witnessed tragedy give legitimacy to the claim for damages.

We are satisfied that our common law has evolved to a point that would recognize a valid cause of action for the emotional injuries suffered by parents in this kind of a case. Parents under such facts would be entitled to claim compensatory damages based on their emotional distress and mental anguish proximately caused by the negligent conduct of their doctor that results in the stillbirth of their baby.

### III.

 It is against this backdrop of our contemporary common law that we should examine whether plaintiffs have a statutory cause of action for the recovery under the Wrongful Death Act attributable to their baby's stillbirth. The language, legislative history, and subsequent treatment of the Act and analogous statutory schemes counsel against interpreting the Act to cover the death of a fetus. Further, the availability of a common-law action that satisfactorily accommodates the interests that are implicated supports this conclusion.

Initially, we must consider the language of the Act. This declares that

[w]hen the death of a *person* is caused by a wrongful act, neglect or default, such as would, if death had not ensued, have entitled the person injured to maintain an action for damages resulting from the injury, the person who would have been liable in damages for the injury if death had not ensued shall be liable in an action for damages, notwithstanding the death of the person injured and although the death was caused under circumstances amounting in law to a crime. [*N.J.S.A.* 2A:31–1. (emphasis added).]

The Act thus refers specifically to the wrongful death of a "person," to the "person injured," and to the "death of the person injured." *Ibid.*

At the time the Act was enacted it was not generally thought that a fetus could be considered a "person," in a legal or juridical sense. This is evidenced by the common law, which treated an unborn child as being "merely a part of his mother without separate existence or personality." *Smith v. Brennan*, 31 *N.J.* 353, 356 (1960) (discussing common-law treatment of the unborn); *see Dietrich v. Inhabitants of Northampton*, 138 *Mass.* 14, 52 *Am.Rep.* 242 (1884) (wrongful death statute inapplicable to fetus, as it was considered to have no existence separate from mother); *Stemmer v. Kline*, 128 *N.J.L.* 455 (E. & A.1942) (adopting *Dietrich* analysis in declaring common law basis for denial of recovery for prenatal injuries); *Ryan v. Public Serv. Coordinated Transp.*, 18 *N.J.Misc.* 429 (Sup.Ct. 1940) (same).

It is readily inferable that the Legislature adopted this common-law understanding of the concept of a "person" in the adoption of the Wrongful Death Act. This inference is supported by the fact that when the Legislature subsequently sought to address and treat the status and interests of an unborn child, it did not rely on a broad definition of "person" but more specifically described the pre-birth state of being. For example, when first enacted in 1911, the workers' compensation statute specifically provided that, in addition to the inclusion of "children" in general, a "child *in esse*" could be a dependent. *N.J.S.A.* 34:15–13(f); *accord Morgan v. Susino Const. Co.*, 131 *N.J.L.* 329 (E. & A.1944) (noting inclusion of unborn fetus but finding that rights of unborn are limited to what is found in statute). Similarly, in the more recent Uniform Anatomical Gift Act, a "decedent" is defined as "a deceased person and includes a stillborn infant or fetus." *N.J.S. A.* 26:6–57(b). In addition, at one time the law proscribed abortions, again indicating the Legislature's ability to deal with

the unborn. *See N.J.S.A.* 2A:87–1 (repealed). Conversely, in the context of our criminal homicide laws, the Legislature considered and rejected the opportunity to classify a fetus as a "person." *See 2 Final Report of the New Jersey Criminal Law Revision Commission: Commentary* 150 (1971) (noting that at common-law homicide could be committed only against a "human being" and that this did not include a fetus); *see also State in the Interest of A.W.S.,* 182 *N.J.Super.* 278, 280 (App. Div.1981) (noting common-law and statutory history in finding homicide law inapplicable to fetal death); *cf. Justus v. Atchinson,* 19 *Cal.*3d 564, 579, 565 *P.*2d 122, 132, 139 *Cal.Rptr.* 97, 107 (1977) (noting that after prior holding that "human being" did not include a fetus, the California murder statute was amended to apply to the killing of "a human being, or a fetus").

Further support for narrowly interpreting the term "person" in this context is found in the history underlying the development of wrongful-death actions. Such causes of action were unrecognized at common law. The Anglo–American history of wrongful-death actions commenced with the pronouncement in *Baker v. Bolton,* 1 *Camp.* 493, 170 *Eng.Rep.* 1033 (1808), that "[i]n a civil Court, the death of a human being could not be complained of as an injury and ... the damage, as to the [deceased], must stop with the period of her existence." *See* Holdsworth, "The Origin of the Rule in *Baker v. Bolton,*" 32 *L.Q.Rev.* 431 (1916). *Baker* became firmly accepted as a common-law principle, *see Admirality Commr's v. S.S. Amerika,* [1917] AC 38 (British House of Lords holding that the common-law rule against recovery for wrongful death should continue except as modified by statute), and was fully incorporated into the common law of the American states. *See, e.g., Carey v. Berkshire R.R.,* 55 *Mass.* 475, 48 *Am.Dec.* 616 (1848); *Eden v. Lexington & Frankfort R. Co.,* 53 *Ky.* 204, 206 (1853). New Jersey fully adopted this common-law rule. *See, e.g., Myers v. Holborn,* 58 *N.J.L.* 193 (E. & A.1895); *Grosso v. Delaware,*

*Lackawanna & West R. Co.*, 50 *N.J.L.* 317, 323 (Sup.Ct.1888).[1]

The Legislature, reacting to the common-law rule, followed the British example of the 1846 Lord Campbell's Act providing a statutory right to such recovery. Fatal Accidents Act of 1846 (Lord Campbell's Act), 9 & 10 *Vict., c.* 93. As a result, on March 3, 1848, it passed an "Act to provide for the recovery of damages in cases where the death of a person is caused by wrongful act, neglect or default," *P.L.* 1848, *p.* 151, the direct predecessor of our current Act. This early enactment provided a right of recovery for survivors of a decedent attributable to the wrongful death resulting from the injuries suffered by the decedent. Unlike the cause of action for injuries of a decedent, which passed to the decedent's estate, this was a "new and separate cause of action" arising in favor of the beneficiaries named under the Act. *See Kotkin v. Caprio*, 65 *N.J.Super.* 453 (App.Div.), certif. den., 34 *N.J.* 470 (1961). As observed in *Alfone v. Sarno*, 87 *N.J.* 99, 104 (1981), "the right to recover for wrongful death derives directly from the tortious act or omission of the defendant against the decedent." It thus in essence remains a derivative action based on the harm done to the decedent, and is thus differentiated from personal injury

---

[1]This principle of law was "probably ... a product of the felony-merger rule—a doctrine that disallowed recovery for an act that constituted both a tort and a felony." *Summerfield v. Superior Court, Maricopa Cty.,* 144 *Ariz.* 467, 471, 698 *P.*2d 712, 716 (1985). Under this rule a tort was considered less important than an offense against the Crown and, as a result, was merged into, or pre-empted by, a felony. As noted in *Moragne v. States Marine Lines,* 398 *U.S.* 375, 382, 90 *S.Ct.* 1772, 1778, 26 *L.Ed.*2d 339, 346 (1970),

> [t]he doctrine found practical justification in the fact that the punishment for the felony was the death of the felon and the forfeiture of his property to the Crown; thus, after the crime had been punished, nothing remained of the felon or his property on which to base a civil action.

*See also Higgins v. Bultcher, Yal* 89, 80 *Eng.Rep.* 61 (KB 1606) (under felony-merger doctrine, the murder of one's servant converts the offense into a felony so that any action for battery and loss of service is lost).

Whether or not the ancient felony-merger doctrine itself gave rise to the principle of law expressed in *Baker* is of only passing historical curiosity in light of the widespread adoption of the *Baker* rule as stating the common law.

actions brought by the decedent prior to death, or by survivors resulting from injuries they directly suffered due to the wrongful death.

It is important to appreciate that because "[t]he wrongful death action was unknown to the common law," it has consequently and consistently been regarded as "the creature of statute." *Schmoll v. Creecy*, 54 *N.J.* 194, 197 (1969). The legislative purpose behind it clearly embraces the intent to create an entirely new and distinctive cause of action where none had existed before. This original understanding is confirmed by the course of subsequent legislative amendments that served to regulate the statute's remedy. *See, e.g., L.*1960, *c.* 194; *L.*1948, *c.* 429. These reflect the legislature's intent to control the scope of the statute and nature of this remedy.

It is fairly inferable from this legislative history that the Act's framers, while leaving untouched the general field of tort actions for personal injuries as one basically appropriate for common-law development, intended to "occupy the field" with respect to any derivative cause of action in favor of survivors that was attributable to the tortious act resulting in the death of the decedent. *See Justus, supra,* 19 *Cal.*3d at 574, 565 *P.*2d at 128, 139 *Cal.Rptr.* at 103 (California Wrongful Death Act said to "occupy the field" of actions in this area); *Egbert v. Wenzl*, 199 *Neb.* 573, 575–76, 260 *N.W.*2d 480, 482 (1977) (adopting *Justus* analysis in refusing to apply wrongful death act to fetus). Consequently, this legislative intention to provide a limited right of recovery in the face of the common-law bar against such actions supports our reluctance to extend the definition of "person" found in this Act beyond its original boundaries. *Cf. Justus, supra,* 19 *Cal.*3d at 575, 565 *P.*2d at 129, 139 *Cal.Rptr.* at 104 (quoting *Pritchard v. Whitney Estate Co.*, 164 *Cal.* 564, 568, 129 *P.* 989, 992 (1913)) ("the cause of action for wrongful death 'exists only so far and in favor of such person as the legislative power may declare.' "); *Hogan v. McDaniel*, 204 *Tenn.* 235, 238–40, 319 *S.W.*2d 221, 222–23

(1958) (refusing to extend wrongful death statute to unborn, twenty-two years prior to statutory amendment doing so).

The Legislature has in other ways dealt with the consequences of the prenatal condition. Thus, once born, children have been permitted to acquire rights or interests by way of inheritance or other devolution of property. *See, e.g., In re Ransom's Estate,* 89 *N.J.Super.* 224 (App.Div.1965) (acknowledging possibility of afterborn children to share in estate). Their interests may receive other protections even prior to birth. *See, e.g., Hoener v. Bertinato,* 67 *N.J.Super.* 517 (J. & D.R.Ct.1961) (prior to birth permissible to order custody of child over to state so that, upon birth, state can order necessary medical treatment over parental objections). In a similar vein a child has been allowed to recover for its prenatal injuries. *Smith v. Brennan, supra,* 31 *N.J.* 353; *see also Day v. Nationwide Mut. Ins. Co.,* 328 *So.*2d 560 (Fla.App.1976) (child born alive, having suffered prenatal injuries at any time after conception, has cause of action against alleged tortfeasor); *Delgado v. Yandell,* 468 *S.W.*2d 475 (Tex.Civ.App.), aff'd 471 *S.W.*2d 569 (Tex.1971) (irrelevant at what period the prenatal injuries occur as long as child is born alive and survives). The interest protected in these cases is that of the child *after* birth; it is not a prenatal right. "[T]he right attaches, not to the embryo or fetus, but to the living child." *People v. Belous,* 71 *Cal.*2d 954, 968 n. 12, 458 *P.*2d 194, 203 n. 12, 80 *Cal.Rptr.* 354, 363 n. 12 (1969), *cert.* den. sub *nom. California v. Belous,* 397 *U.S.* 915, 90 *S.Ct.* 920, 25 *L.Ed.*2d 96 (1970); *see Endresz v. Friedberg,* 24 *N.Y.*2d 478, 485, 248 *N.E.*2d 901, 904, 301 *N.Y.S.* 2d 65, 70 (1969) ("In point of fact, although an unborn child has certain rights under property law, his enjoyment of those rights is contingent upon his being born alive.").

■ Further support for a view of the statute that would bar an action attributable to fetal death is provided by the Legislature's refusal to amend the Act despite the fact that it has been found inapplicable to the unborn since its passage. We ac-

knowledge that such legislative "silence" is not necessarily indicative of legislative approval of a judicial or other legal interpretation of a statute. *See Masse v. Public Employees Retirement Sys.*, 87 *N.J.* 252, 264 (1981); *White v. Township of N. Bergen*, 77 *N.J.* 538, 555–56 (1978). Nevertheless, the history of the application of the Act in no way suggests disapproval or discontent with the definition of "person" given by this Court. If anything it supports, as consistent with the original legislative enactment, the continuation of the statutory bar against fetal rights in this area. *See Hamby v. McDaniel*, 559 *S.W.*2d 774 (Tenn.1977) (making similar argument three years before statutory amendment giving fetus right of action); *Stern v. Miller*, 348 *So.*2d 303, 307 (Fla.1977) (refusing to permit action for stillbirth since "person" had been found not to include fetus prior to 1972 consolidation of wrongful-death provisions and Legislature chose not to take opportunity to further define the term at that time).

We acknowledge that in the years since *Graf, supra,* 43 *N.J.* 303, the trend of cases in other states has favored permitting wrongful death actions based on the death of a fetus. *See* Annotation, Right to Maintain Action or to Recover Damages for Death of Unborn Child, 84 *A.L.R.*3d 411 (1978 & Supp.1988). This development is understandable and commendable. We discount the fact that these cases merely substitute one bright-line rule, viability, for another, live-birth, or that determinations of viability involve inherent factual complexities and increased speculativeness. *See Endresz, supra,* 24 *N.Y.*2d at 486, 248 *N.E.*2d at 905, 301 *N.Y.S.*2d at 71 ("To make viability rather than birth the test would not remove the difficulty [of arbitrariness] but merely relocate it and increase hundred fold the problems of causation and damages."); *see also* Kass, "Determining Death and Viability in Fetuses and Abortuses," *Research on the Fetus: Appendix,* 11–1, 11–10 to –13 (Nat'l Comm'n for the Protection of Human Subjects of Biomedical and Behavioral Research ed. 1975) (noting problems in determining when viability begins and in actually proving capability

of fetus to survive outside womb). These concerns do not suggest that an expansive interpretation of the statute should be resisted. However, other considerations do. The distinctive statutory nature of this derivative cause of action, the historical origins of this statute and the subsequent history and evolution of the Wrongful Death Act in this state suggest that the traditional definition of "person" under the Act be retained. We are persuaded ultimately because we find no compelling underlying policy that would impel us to give the statutory term "person" an expansive interpretation here. *Compare Weitl v. Moses,* 311 *N.W.*2d 259, 271 (Iowa 1981), overruled on other grounds, *Audubon–Exira Ready Mix v. Illinois Gulf R. Co.,* 335 *N.W.*2d 148 (Iowa 1983) (refusing to extend wrongful death statute to fetus) *with Dunn v. RoseWay, Inc.,* 333 *N.W.*2d 830 (Iowa 1983) (finding right of action for death of fetus under Rule 8 of Iowa Rules of Civil Procedure).[2]

Our reasons for not adopting a more expansive interpretation of the statutory term "person" in this context do not relate to the speculative nature of damages that would occur if fetal death qualified as an actionable wrongful death under the Act.

---

[2]We note that under *Smith, supra,* 31 *N.J.* 353, a child may recover for tortiously inflicted prenatal injuries, and find that this satisfies the requirement limiting recovery to situations where the decedent's death was one "such as would, if death had not ensued, have entitled the person injured to maintain an action for damages resulting from the injury." *N.J.S.A.* 2A:31–1; *see Graf, supra,* 43 *N.J.* at 305–06 (reaching some conclusion on the meaning of requirement that recovery be possible only if party could have recovered if she had not died); *see also Presslaff v. Robins,* 168 *N.J.Super.* 543 (App.Div.1979) ("if death had not ensued" language intended only to qualify kind of actionable conduct of tortfeasor that will support lawsuit). We thus disagree with those jurisdictions that would disqualify a fetus on these grounds. *See Weitl, supra,* 311 *N.W.* at 270; *Lawrence v. Craven Tire Co.,* 210 *Va.* 138, 139–41, 169 *S.E.*2d 440, 441 (1969). Nevertheless, whether this requirement is satisfied in no way determines whether or not a fetus meets the first requirement of being a "person" for purposes of the Act. Indeed, as *Smith, supra,* itself noted, whether an unborn child is a "person" was totally "immaterial" to the question it dealt with since it only found "that a child has a legal right to *begin* life with a sound mind and body." 31 *N.J.* at 364 (emphasis added).

This concern has not discouraged our recognition of the need for recovery in similar cases in recent years. *Compare Green v. Bittner*, 85 *N.J.* 1 (1980) (discounting speculative nature of pecuniary loss suffered by parents due to the child's death) *with Graf, supra*, 43 *N.J.* at 310–11 (barring recovery for death of fetus due to the then perceived over-speculative nature of any damages). Our determination is based on our perception that a fetus was not intended to be included in the statute as a being whose death can give rise to a claim for pecuniary loss by next-of-kin, and that modifying the statute to do this is unnecessary in light of the concomitant common-law right we determine to exist. Thus, the question of speculativeness of any damage recovery, as such, is not crucial. We find that the Legislature in enacting the original Act, and in subsequent revisions, never intended to create a derivative action in favor of the survivors of a fetus never born alive and that in the contemporary setting the legislative purpose will not be frustrated by adherence to this original and continuing understanding.

We are mindful of the common-law principle that when the reasons that underlie a law change, the law itself should change. This principle can apply even to statutes whose provisions incorporate common-law concepts, where

> fundamental changes ..., that were unforeseen at the time of initial legislative action, have required the reinterpretation and fresh application of relevant statutory law in order to avoid the inadvertent and unintended creation of a statutory anomaly or hiatus and to preserve for such legislation a sensible place in the contemporary scene. [*Renz v. Penn Central R.R.*, 87 *N.J.* 437, 458 (1981).]

*See Immer v. Risko*, 56 *N.J.* 482 (1970). Here, however, the emergence of different reasons and changing social policy has not served to create a statutory anomaly or to undermine legislative goals, and, hence, does not impel us to expand or modify the Wrongful Death Act. While public policy has indeed changed with respect to our understanding of parental rights and interests and the value we place on them, these changes have in effect been accommodated by the parallel growth of our common law. As discussed earlier, our evolving

tort law system can adequately protect the interests that are implicated in wrongful fetal death. Therefore, there is no need to modify this statute in order to effectuate its purpose.

## IV.

The plaintiffs in this case as parents of a stillborn have suffered a cognizable injury deserving of compensation. The Wrongful Death Act, however, does not recognize this cause of action. We conclude that, for the reasons set forth, the courts below were correct in determining the Act inapplicable.

For these reasons, and because plaintiffs have sought to present and maintain only a cause of action under the Wrongful Death Act, we affirm the decision below.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal*—None.