267 N.J. Super. 102 (1991)
630 A.2d 843
STATE OF NEW JERSEY, PLAINTIFF,
v.
ALEXANDER V. LOCE, ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division Morris County.
Decided September 6, 1991.
*103 Deborah Collins, Assistant Prosecutor (W. Michael Murphy, Jr., Morris County Prosecutor, attorney), for the State.
Patrick J. Mullaney for defendant Alexander V. Loce.
Roger W. Daley for defendants Charles Matson, David Lickteig, Jeannie Henderson, Tyrone Malone, Neal Webster and Ralph Traphagen.
Richard J. Traynor for defendants Tiny Krail, Lori Chadwick, James McWilliams, Chris Moschinski, Deborah Smoldore, William Harrison, John Adams and Lisa Adams.
Michael Patrick Carroll for New Jersey Right to Life, amicus curiae.
Lisa Glick Zucker (Deborah A. Ellis, attorney) for American Civil Liberties Union of New Jersey, Americans for Democratic Action, Choice PAC New Jersey, 80% Majority Campaign, Family Planning Association of New Jersey, League of Women Voters of New Jersey, National Organization for Women, New Jersey State Council of YMCA's, Planned Parenthood Affiliate of New Jersey, Right to Choose, South Jersey Catholics for Free Choice, amici curiae.
STANTON, A.J.S.C.
As a result of intercourse with defendant Alexander V. Loce, Ms. Z. became pregnant. She informed Mr. Loce that she had arranged for an abortion to be performed in a certain physician's office in Morristown on September 8, 1990. On September 8, Ms. *104 Z. would have been pregnant for about eight weeks. There was no problem with the health either of Ms. Z or the fetus.
Mr. Loce urged Ms. Z not to have the abortion, but she persisted in her announced intention to have one. On September 7, Mr. Loce applied to the Chancery Division of the Superior Court for an order prohibiting the abortion. This request was promptly rejected by the Chancery Division. On September 7, Mr. Loce appealed on an emergency basis from the Chancery Division's denial of relief to the Appellate Division of the Superior Court and then to the New Jersey Supreme Court. Both appeals were rejected. On September 8, Mr. Loce, accompanied by 14 anti-abortion activists who are the other defendants in this matter, forced his way into the physician's office where the abortion was to be performed. All 15 defendants handcuffed themselves together and physically blocked movement within the office with the intent to forcibly prevent the physician from performing the abortion. Defendants persisted in their violent obstruction of the office despite legal notice to leave. They were arrested and removed from the office by the police. The abortion took place on September 8, 1990.
All defendants were convicted of the petty disorderly persons offense of defiant trespass under N.J.S.A. 2C:18-3(b). Each of them was fined $250 and required to pay court costs and a Violent Crimes Compensation Board penalty. All defendants have appealed to the Law Division of the Superior Court and their appeals are now before me for decision. The present appellate proceeding is technically known as a trial de novo on the record below. R. 3:23-8(a). This means that I must make original findings and rulings on the evidence, but that I am limited to the evidentiary record created in the Municipal Court.
The record in this case establishes beyond a reasonable doubt that all defendants are guilty of violating the defiant trespass provisions of the New Jersey Criminal Code, unless some superseding constitutional or legal rule excuses or justifies disobedience of the defiant trespass statute. The defendants have attempted *105 to establish such superseding constitutional rules and such superseding legal rules. They have introduced testimony of Jerome Le Jeune, M.D. Ph.D., a professor of genetics, of Bernard Nathanson, M.D., an obstetrician and gynecologist, and of Francis Russel Hittinger, Ph.D., a philosopher. The purpose of the testimony is to establish that the fetus being carried by Ms. Z was a human being on September 8, 1990 and had been a human being ever since the moment of its conception. (For ease of expression, I will use the term "fetus" in this opinion to cover the entire prenatal process, and I include within it stages which are technically more precisely referred to as zygote, morula, embryo and fetus.)
Based on the claimed fact that the fetus was a human being, the defendants argue that it was a person within the meaning of the Fourteenth Amendment of the United State Constitution, which reads in pertinent part: "... nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The defendants also argue that the fetus was a person within the meaning of Article I, Paragraph 1, of the New Jersey Constitution which reads: "All persons are by nature free and independent and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."
Based on the concept that the fetus was a person, the defendants also asserted statutory affirmative defenses under N.J.S.A. 2C:3-5 (the right to use reasonable force to protect another person), N.J.S.A. 2C:3-2 (the right to use force as being necessary to save a person), N.J.S.A. 2C:3-8 (the right of a person entrusted with special responsibility for the care, supervising, discipline or safety of another person to use force to protect that other person; Mr. Loce being the father of the fetus) and N.J.S.A. 2C:3-10 (the right to seize property under certain circumstances to protect a person).
*106 The most straightforward legal analysis of defendants' arguments that they were justified in disobeying the defiant trespass statute because of state and federal constitutional principles and because of state statutory affirmative defenses is as follows: The United States Supreme Court has ruled that a fetus is not a person within the meaning of the Fourteenth Amendment or within the meaning of any other provision of the United States Constitution. Roe v. Wade, 410 U.S. 113, 156-159, 93 S.Ct. 705, 728-730, 35 L.Ed.2d 147 (1973). In Right to Choose v. Byrne, 91 N.J. 287, 299, 450 A.2d 925 (1982), the New Jersey Supreme Court expressly purported to decline to determine when life begins or at what point a fetus is a person. But the Court so clearly gave priority to the health claims of the mother over the life claims of the fetus (and without going through any balancing of rights analysis) that the necessary inference, in my view, is that the Court actually treated the fetus as not being a person. 91 N.J. at 310, 450 A.2d 925. See also Giardina v. Bennett, 111 N.J. 412, 420-422, 545 A.2d 139 (1988), holding that a fetus is not a person within the meaning of the Wrongful Death Act, and State in the Interest of A.W.S., 182 N.J. Super. 278, 440 A.2d 1144 (App.Div. 1981), holding that a fetus is not a human being within the meaning of the criminal homicide provisions of the Code of Criminal Justice. So far as defendants' claimed statutory justification under N.J.S.A. 2C:3-5, 2C:3-2, 2C:3-8 and 2C:3-10 is concerned, the language of the statutory provisions, the legislative history and the desirability of construing statutes so as to be compatible with constitutional limitations all lead me to conclude that the New Jersey Legislature in enacting the Code of Criminal Justice in 1978 probably did not intend to treat a fetus as a person, and certainly not when doing so would limit a woman's constitutionally protected right to have an abortion. Here I must note that statutory provisions dealing with justification are to be construed in the context of ordinary, traditional crimes where we have independently functioning people interacting violently with each other. If a fetus is a person, it is a person in very special circumstances  it exists entirely within the body of another much *107 larger person and usually cannot be the object of direct action by another person. In short, as a trial judge of the Superior Court of New Jersey, I cannot find any legally acceptable basis for excusing or justifying the conduct of the defendants in disobeying the defiant trespass statute.
I also note that when the New Jersey Legislature adopted the present Code of Criminal Justice in 1978, it abolished all common law crimes. N.J.S.A. 2C:1-5. It also repealed most pre-existing statutory crimes. N.J.S.A. 2C:98-2. The present Code of Criminal Justice does not prohibit abortion or regulate it in any way. Hence, entirely aside from judicial interpretation of the United States Constitution and the New Jersey Constitution, women have been legally free to have an abortion in New Jersey for more than 20 years. The Legislature could not have intended to authorize other persons to use force to prevent a woman from doing what she had a legal right to do.
I am sure that defendants and their counsel have anticipated all along that a trial judge would be constrained to reach the legal conclusions which I have reached in this case. I believe that the real thrust of their proofs and their arguments has been directed at the appellate courts which may eventually hear this case rather than at the trial judge. They would hope to have me as a trial judge make findings of fact which they might later use as a base for moral and legal arguments before appellate courts. Ultimately, they would like to persuade the United States Supreme Court to overrule Roe v. Wade.
The particular finding of fact which defendants urge me to make is that a fetus is a human being from the moment at which the sperm and the egg unite. The testimony of Dr. Le Jeune, of Dr. Nathanson and of Dr. Hittinger is all directed (from varying disciplines and viewpoints) towards that end. I do not regard the question of when human life begins (or the related question of when the fetus becomes a person) as a religious issue, or an abstractly scientific issue, or a remote philosophical issue which is beyond the ken of lawyers and judges. It is an issue of practical *108 ethical importance and of very practical legal impact. Lawyers, judges, legislators and public policy makers have the right, and probably the duty, to address this issue. But they must address it in the right context, with caution, with the right sense of respect, with appropriate humility, and in circumstances likely to produce comprehensive data and rigorous analysis. Under the appropriate conditions, I, for one, would be willing to attempt to make a judicial finding of fact on this issue.
However, the circumstances of this case are not appropriate for judicial fact finding of the kind sought by defendants. The factual record in this case was created in the Morristown Municipal Court in the course of a prosecution for a petty disorderly persons offense. In New Jersey, municipal courts deal with disorderly persons offenses and motor vehicle violations. Their procedures are somewhat summary in nature and are designed to produce fair and quick results in relatively simple cases. Municipal courts do not have the procedural tools or the time to deal with truly complex matters. They are not suitable places in which to adjudicate complicated factual or legal issues. See very generally, Belleville v. Parrillo's, Inc. 83 N.J. 309, 318-319, 416 A.2d 388 (1980).
Drs. Le Jeune, Nathanson and Hittinger are persons of some distinction whose testimony was interesting and thought-provoking. So far as it went, it was arguably plausible. However, the direct examination by defense counsel was highly unstructured. The municipal prosecutor conducted cursory cross-examination because he thought that the witnesses' testimony was irrelevant to the true legal issues in the case. The prosecutor presented no witnesses at all on the issue of when human life begins, again because of perceived irrelevancy. The examination of witnesses was non-probing and the proceeding was totally non-adversarial on this issue. The proofs were so limited and so one-sided that a judge cannot sensibly make a definite finding of fact based upon them.
*109 Furthermore, there has been no careful argument or analysis in this case on the threshold question of whether the issue of when human life begins is an empirical question of fact or an essentially non-empirical value judgment. In any event, whether the issue is one of fact, or of value judgment, or some subtle mixture of fact and value judgment, I will not undertake to make a finding or ruling about when human life begins under the conditions obtaining in this case.
I also note that even if we were to take it as established that human life begins at the moment of conception, that is, when the sperm and the egg unite, it would not necessarily follow either morally or legally that the State could properly use compulsory processes of law to prevent a woman from having an abortion, and it would not necessarily follow that private persons could properly use physical force to prevent a woman from having an abortion. If a fetus is a human being from the moment of conception onwards, I think it would then follow that an abortion would be a serious moral wrong under almost all circumstances at any time during pregnancy. People who thought that a fetus was always a human being (and, indeed, many people who thought that a fetus was only potentially a human being), would probably develop a whole series of interrelated moral rules.
They would encourage men and women to conceive offspring only when they were committed to bringing them into the world and raising them to competent adulthood in a reasonably supportive and loving family environment. They would try to prevent unwanted pregnancies and irresponsible pregnancies. To those ends, they would discourage sexual relations outside of loving, mature and stable relationships, and whenever sexual relations did occur they would encourage the use of effective contraception unless both the man and woman affirmatively wanted a child and were firmly committed to the responsible rearing of the child.
If abortion is viewed as morally wrong under most circumstances, then it seems to me that the first line of attack should be to reduce unwanted pregnancies. Well-designed and effectively *110 implemented programs to promote sexual morality and to promote effective contraception could probably effectively reduce the number of unwanted pregnancies and the number of abortions. However, given the volatility of the human sexual drive and given the inevitable failures of contraceptive measures, I am sure that we will always have a significant number of unwanted pregnancies. When an unwanted pregnancy occurs, if we regard the fetus as a human being, then the woman involved would be under a moral obligation to carry the pregnancy to term, except under very special circumstances involving things such as rape or serious risk to the woman's life. The husband or other male co-responsible for the pregnancy would be morally obliged to be supportive of the woman in sustaining the pregnancy and in raising the child. Concerned persons around the pregnant woman would encourage her to bear the child and would take steps to empower her to do so with dignity and in safety.
Here I think it is useful to say something about the relationship between morality and law. The legal rules of a society are informed by its moral values and are broadly reflective of them. (This is especially true in the area of criminal law.) Legal rules, in turn, often influence our perception of what is moral. However, law and morality are not and should not be identical. There are many important moral principles which cannot and should not be translated on a one-for-one basis into enforceable legal rules. This is particularly true in a society which is free, open and pluralistic and which is legally organized as a constitutional democracy.
In the kind of society which we have in New Jersey and in the United States, if we were to treat a fetus as a human being from the moment of conception onwards, and if we were to treat abortion as morally wrong under almost all circumstances, we would probably adopt some legal rules reflective of that moral value. We would probably have criminal laws protecting women against abusive men, we would probably have health laws making prenatal care available to all pregnant women, we would probably *111 have health laws making medical care available to children, we would probably have laws providing affordable housing for families, we would probably have laws making child care available to working mothers. In fact, we already have some of these laws, because virtually all people think it is right to take at least some legal steps to empower women who want children to bear them safely and raise them decently, even though many people also view abortion as morally valid under many circumstances.
In our society, it might come to pass that most people would view the fetus as a human being from the moment of conception. The interpretation by United States Supreme Court of the United States Constitution might evolve in such a way that federal constitutional limits on anti-abortion laws would be removed. Indeed, such an evolution may be taking place at the present time. See Webster v. Missouri Reproductive Services, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989). A similar process could occur with respect to the New Jersey Supreme Court and the New Jersey Constitution. Or the people might by formal amendment remove existing constitutional limitations. Even if all those things were to happen, I would hope that our legislatures would be wise enough not to recriminalize abortion.
When the law makes it a crime for a woman to have an abortion, or when the law makes it a crime for a physician to perform an abortion, the state is then using legal process to force a woman to carry a pregnancy to term even though she does not want to do so. This inherently involves pervasive governmental intrusion into the internal bodily processes of the woman and into her most intimate emotional and psychological functioning. Many women (and many of the men around them) would feel cruelly violated. They would be bitterly resentful. There would undoubtedly be compliance problems, and, if criminal anti-abortion laws were to be uniformly and effectively enforced, there would probably have to be overt and widespread coercion of substantial numbers of people. The general result would probably be state-sponsored oppression on an enormous scale. I suggest that a legal policy of criminalizing *112 abortion would be most unwise. It would also be unjust and morally wrong.
Even though one might agree with the defendants that a fetus is always a human being, and even though one might agree that abortion is morally wrong, I would suggest that wise moral policy and wise legal policy would seek to help women to avoid having unwanted pregnancies, and when women did become involved in unwanted pregnancies, it would seek to encourage and empower them to sustain the pregnancies and to rear the resulting children under safe and supportive circumstances. Here it is important to reflect upon the special circumstances in which the fetus exists  it exists entirely within the body of its mother. If the mother is unwilling to carry out her moral duty to sustain the pregnancy despite our encouragement and our efforts to empower her to do so, then the only fully effective ways in which the rest of us can help the fetus are by literally cutting open the body of the mother and taking out a fetus which has reached the point of viability, or by literally taking control of the mother's body and monitoring all her activities minute by minute, day by day, until she gives birth. Most of us are not willing to give such power to the state, and we would be even less willing to give it to private parties such as the defendants. Human experience teaches us that limitless power to do good can too readily become unlimited power to oppress and to enslave. Accordingly, wise moral policy and wise legal policy would stop short of coercing women to have children against their will.

---------
Much of what I have said above with respect to abortion is not directly applicable to the actual circumstances in which defendants find themselves. When the defendants used force on September 8, 1990 to physically prevent Ms. Z from having an abortion, Ms. Z. had the right under the United States Constitution, under the New Jersey Constitution and under federal and state statutory law to have an abortion. Defendants disagreed with the constitutional rulings involved and with the statutory laws. They had the *113 right to disagree and they had the right in our free, open, constitutional democracy to work lawfully in a wide variety of ways to change existing constitutional and legal rules.
When the defendants forced their way into the physician's office on September 8, 1990 to physically obstruct the physician and his staff from performing the abortion and to physically obstruct Ms. Z from having the abortion, they used violence. The violence was not as bad as striking the physician, or the staff or Ms. Z would have been, but it was real violence, significant violence. When the defendants employed that violence, they, in effect, asserted that they were not bound by the normal decencies and constraints of our constitutional democracy. They asserted that they had the right to impose their views about abortion by physical force upon Ms. Z. They also asserted that they had the right to impose their views by force upon society in general. When they did that, the defendants mounted a frontal assault upon the whole concept of ordered liberty by which our society is governed. They trampled upon the fundamental constitutional values by which we conduct our civil society.
There is undoubtedly much room for disagreement about what our society's approach to the problem of abortion should be. However, I see little room for disagreement about the wrongness of the way in which the defendants conducted themselves on September 8, 1990. Their general intent may have been good, but what they did was profoundly wrong. Each of them deserves the condemnation of a criminal conviction. Each of them is guilty of defiant trespass. Each is fined $250. Each of them must pay court costs of $25 to the Morristown Municipal Court. Each of them must pay a penalty of $30 to the Violent Crimes Compensation Board.