930 A.2d 416

ROSA ACUNA ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF ANDRES ACUNA, DECEASED INFANT OF ROSA ACUNA, GENERAL ADMINISTRATRIX OF THE ESTATE OF ANDRES ACUNA, DECEASED INFANT OF ROSA ACUNA, AND ROSA ACUNA INDIVIDUALLY, PLAINTIFF–RESPONDENT, v. SHELDON C. TURKISH, M.D., AND OBSTETRICAL AND GYNECOLOGICAL GROUP OF PERTH AMBOY–EDISON, A PARTNERSHIP OF P.C. ORGANIZED UNDER THE LAWS OF THE STATE OF NEW JERSEY, DEFENDANTS–APPELLANTS, AND JANET JONES, R.N. (A FICTITIOUS NAME OF A REAL INDIVIDUAL), DEFENDANT.

Argued February 20, 2007—Decided September 12, 2007.

400

*John Zen Jackson* argued the cause for appellants (*Kalison, McBride, Jackson & Murphy,* attorneys; *Mr. Jackson* and *Leonardo M. Tamburello,* on the briefs).

*Harold J. Cassidy* argued the cause for respondent (*Harold J. Cassidy & Associates,* attorneys; *Mr. Cassidy, Robert W. Ruggieri* and *Thomas J. Viggiano, III,* on the briefs).

*Susan Talcott Camp* argued the cause for *amici curiae* American Civil Liberties Union and American Civil Liberties Union of

New Jersey (*Edward L. Barocas,* attorney; *Ms. Camp, Mr. Barocas* and *Brigitte A. Amiri,* a member of the New York bar, on the brief).

*E. Drew Britcher* submitted a brief on behalf of *amicus curiae* New Jersey Obstetric and Gynecology Society (*Britcher, Leone & Roth,* attorneys; *Mr. Britcher* and *Jessica E. Choper,* on the brief).

Justice ALBIN delivered the opinion of the Court.

Plaintiff Rosa Acuna filed a malpractice action against Dr. Sheldon Turkish, her obstetrician-gynecologist, claiming that she did not give him informed consent to perform a procedure terminating her pregnancy. In her complaint, plaintiff specifically alleges that Dr. Turkish breached a duty owed to her by failing to inform her of "the scientific and medical fact that [her six- to eight-week-old embryo] was a complete, separate, unique and irreplaceable human being" and that an abortion would result in "killing an existing human being." Plaintiff contends that every physician, before performing an abortion, must advise the patient in clear and understandable language that "the family member [the embryo] is already in existence and that the procedure—indeed the central purpose of the procedure—is intended to kill that family member."

Although a physician unquestionably has a common law duty to provide a woman with material information concerning the medical risks of a procedure terminating a pregnancy, we know of no common law duty requiring a physician to instruct the woman that the embryo is an "existing human being," and suggesting that an abortion is tantamount to murder. There is not even remotely a consensus among New Jersey's medical community or citizenry that plaintiff's assertions are medical facts, as opposed to firmly held moral, philosophical, and religious beliefs, to support the establishment of the duty she would impose on all physicians. Because the duty that plaintiff claims defendant breached did not exist at the time of their physician-patient relationship and because there is no basis for this Court to create a new duty that has

no broad support in either the medical community or society, we reverse the Appellate Division and reinstate the trial court's dismissal of plaintiff's lawsuit.

## I.

### A.

On April 6, 1996, plaintiff Rosa Acuna, then age twenty-nine, consulted with defendant Dr. Sheldon Turkish, complaining of abdominal pains and headaches.[1] After examining plaintiff and conducting an ultrasound, defendant told plaintiff that she was pregnant. The ultrasound revealed that plaintiff was in her sixth to eighth week of pregnancy.[2] Plaintiff was married and the mother of two daughters under the age of three, and had suffered a miscarriage in her first pregnancy. Defendant, a practicing physician for more than thirty years, had been her regular gynecologist for five years and had delivered her youngest child.

Beginning in high school, plaintiff had suffered from renal glycosuria, a kidney disorder. According to plaintiff, defendant advised her that due to complications with her kidneys, unless she had an abortion she would have only three months to live. Defendant denied making that statement or ever having an experience in which he was required to encourage a woman to terminate a pregnancy to preserve her health. Indeed, defendant claimed that plaintiff introduced the subject of abortion as an option.[3]

Plaintiff said that she asked defendant "if it was the baby in there" and that defendant replied, "don't be stupid, it's only

---

[1] The statement of facts is based on the summary judgment record in the trial court. At the summary judgment stage, we view the facts in the light most favorable to the non-moving party, plaintiff. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.2d* 146 (1995).

[2] Plaintiff's last menstrual period was February 21, 1996. By that calculation, the embryo was no more than seven weeks old.

[3] Defendant's assistant, Brenda Salerno, vaguely remembered that plaintiff expressed that "she wanted to end the pregnancy because she ha[d] two small

blood." Defendant could not recall how he responded but believes he likely would have told her that a "seven-week pregnancy is not a living human being," but rather it "is just tissue at this time."

Plaintiff admitted in a deposition that she obviously knew she was pregnant, but that she "just needed to know and [she] wanted to know if the baby was—if there was a baby already in [her]." When asked what she meant by baby, plaintiff stated, "[a] human being." In a certification, plaintiff explained that "[a]t the start of a pregnancy, [she] knew that at some future date a human being would come into existence." She understood that without some intervening circumstance or medical procedure, a child would be born, but what she needed to hear on the day of her visit to defendant's office was that she was carrying then "an existing living human being."

After consulting with her husband, plaintiff returned to defendant's office three days later and signed a form giving her consent to perform a "TOP" (termination of pregnancy). On the form, plaintiff acknowledged that defendant "explained all of the risks and complications to [her]." That same day, defendant performed a vacuum aspiration, which ended the pregnancy.[4]

In the weeks afterwards, plaintiff experienced vaginal bleeding, and on May 4 was admitted into Robert Wood Johnson Hospital where she was diagnosed with an "incomplete abortion." A dilatation and curettage was performed. After the procedure, plaintiff asked a nurse "what had happened." The nurse replied "that the doctor had left parts of the baby inside of you."[5] At

___

children at home" and that her pregnancy was "too soon after the birth of her second child."

[4] A vacuum aspiration is a procedure "in which the physician vacuums out the embryonic tissue." *Gonzales v. Carhart,* 550 *U.S.* ——, 127 *S.Ct.* 1610, 1620, 167 *L.Ed.*2d 480, 495 (2007).

[5] The pathology report indicated that the dilatation and curettage procedure yielded only chorionic villi, the lining of the uterus, and not fetal parts.

that point, plaintiff "started to realize that [there] was a baby and not just blood" inside of her.

After her release from the hospital, plaintiff began to do research on "early pregnancies and babies in their mother's womb," looking for answers and trying to reconcile the nurse's remarks with defendant's characterization of her pregnancy. Eventually, she concluded that the abortion procedure killed "a human being." That realization was followed by a decline in her mental health and a later diagnosis of post-traumatic stress disorder.

## B.

Plaintiff, individually and as administratrix of the estate of her "deceased infant," Andres Acuna, filed an eleven-count malpractice complaint in the Law Division, Middlesex County, naming as defendants Dr. Turkish, his medical group (Obstetrical and Gynecological Group of Perth Amboy–Edison), and a nurse not then identified, but fictitiously named as Janet Jones, R.N.[6] Plaintiff asserted wrongful death and survival claims on Andres' behalf and negligent infliction of emotional distress, negligence, and lack-of-informed-consent claims on her own behalf.[7]

Plaintiff's lawsuit primarily focused on the theory of lack of informed consent. The complaint alleged that defendant failed to inform plaintiff that (1) "[Andres] Acuna, although a person unborn, was a complete, separate, unique and irreplaceable human being"; (2) there existed the potential risk that Andres "was capable of experiencing pain" at eight weeks gestation; (3) abortion involved "actually killing an existing human being"; (4) she would be at risk of suffering from "post-abortion syndrome," a form of a post-traumatic stress disorder; and (5) she would come

---

[6] Here, we refer to the "third amended medical malpractice complaint and jury demand" filed on July 28, 2003. The original complaint was filed on April 8, 1998.

[7] The counts relating to the nurse were later dismissed by plaintiff.

to realize that she "was responsible for killing her own child" and bear a weight of guilt for the rest of her life. Plaintiff further alleged that had defendant provided her with the necessary "scientific, medical and factual information surrounding the nature of abortion and the fact that [Andres] Acuna was a complete, separate and unique human being she would not have had the abortion procedure."

The Honorable Douglas T. Hague, J.S.C., granted defendant's motion for partial summary judgment on the wrongful death, survival, and emotional distress causes of action. Judge Hague held that a six- to eight-week-old "fetus" is a not a "person" under the Fourteenth Amendment, (citing *Roe v. Wade*, 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.*2d 147 (1973)), or under the laws of this State for purposes of maintaining claims for wrongful death, survival, or negligent infliction of emotional distress, (citing *Giardina v. Bennett*, 111 *N.J.* 412, 545 *A.*2d 139 (1988)). Plaintiff's negligence claim based on a theory of lack of informed consent was not implicated in that summary judgment motion.

The Appellate Division granted plaintiff's motion for leave to appeal and affirmed the dismissal of the wrongful death claim, but reversed the dismissal of the emotional distress claim. *Acuna v. Turkish*, 354 *N.J.Super.* 500, 505, 808 *A.*2d 149 (App.Div.2002) (*Acuna I*). In upholding the dismissal of the wrongful death claim, the panel first found that no fundamental right was "implicated by *Giardina's* holding that the Wrongful Death Act does not permit recovery attributable to the wrongful death of a fetus." *Id.* at 511, 808 *A.*2d 149. The panel rejected plaintiff's contention that the Federal Constitution's equal protection guarantee is violated by allowing recovery for the wrongful death of a child who dies after birth from a tortious injury suffered in utero, but yet no recovery for a fetus that dies in the mother's body from the same tortious injury. *Id.* at 508, 513, 808 *A.*2d 149. Adopting the reasoning of *Alexander v. Whitman*, 114 *F.*3d 1392, 1400 (3d Cir.), *cert. denied*, 522 *U.S.* 949, 118 *S.Ct.* 367, 139 *L.Ed.*2d 286 (1997), which rejected a similar argument, the panel stated: " '[a] mother's relationship

with her fetus is exactly the same whether or not she can bring a wrongful death or survivor action. It is not the relationship that is affected here, it is the ability to recover for the loss of that relationship.'" *Acuna I, supra,* 354 *N.J.Super.* at 511, 808 *A.*2d 149 (alteration in original) (quoting *Alexander, supra,* 114 *F.*3d at 1404).

Next, the panel explained "that the trial court erred in dismissing [plaintiff's] emotional distress claim on the basis that a fetus is not a 'constitutional person.'" *Id.* at 515, 808 *A.*2d 149. That was so because the alleged malpractice—the failure to obtain informed consent—was not a derivative claim but committed directly against plaintiff. *Ibid.* The panel recognized that a mother who was not advised by her physician of material information before terminating an eight-week-old pregnancy might suffer severe distress and mental anguish. *Id.* at 518, 808 *A.*2d 149. The panel was guided by *Giardina, supra,* 111 *N.J.* at 420, 545 *A.*2d 139, which held that parents whose infant was delivered stillborn due to medical malpractice could recover damages under a theory of negligent infliction of emotional distress. *Acuna I, supra,* 354 *N.J.Super.* at 516–17, 808 *A.*2d 149. The panel concluded that the present case could not be logically distinguished from *Giardina* solely because the fetus did not survive to term.[8] *Id.* at 517, 808 *A.*2d 149. The panel also considered the emotional distress claim "as a logical complement to the 'wrongful birth' cases, ... which focus on 'the parents' lost opportunity to make the personal decision of whether or not to give birth to a child who might have birth defects.'" *Id.* at 518, 808 *A.*2d 149 (quoting *Canesi v. Wilson,* 158 *N.J.* 490, 501–02, 730 *A.*2d 805 (1999)). Accordingly, the emotional distress cause of action was reinstated. *Ibid.*

Although the *Acuna I* court assumed that a physician owes a duty of care to disclose to a pregnant woman "information that a

---

[8] *Portee v. Jaffee,* 84 *N.J.* 88, 101, 417 *A.*2d 521 (1980), held that an emotional distress claim cannot proceed unless the plaintiff has a marital, familial, or intimate relationship with the "injured person."

prudent patient might find significant in deciding whether or not to terminate her pregnancy," notably, it did not address "the fact-sensitive issues concerning what dangers incident to, or consequences resulting from, such [an abortion] procedure would be 'material' to the 'prudent patient.' " *Id.* at 514, 808 *A.*2d 149. The parties agreed that the resolution of those issues needed to "await a complete factual record." *Ibid.*

## C.

On remand, based on her review of the complete record, the Honorable Amy P. Chambers, P.J. Cv., granted defendant's motion for summary judgment on plaintiff's remaining claims. Judge Chambers observed that although the Appellate Division ruled that a woman could maintain an emotional distress claim against a physician who does not obtain informed consent before terminating a pregnancy, it did not decide whether plaintiff had presented facts to support her claim that defendant withheld from her material information that a reasonably prudent woman would need to know before consenting to an abortion. In the summary judgment motion, Judge Chambers had to address the assertion cast by plaintiff in her complaint—that, as a matter of law, defendant had a duty to inform plaintiff that her embryo "was a complete, separate, unique and irreplaceable human being" and that an abortion resulted in "killing an existing human being."

Judge Chambers noted that the issue raised did not concern "the information a physician should provide a woman about the stage of her pregnancy or the embryonic and fetal development process" or the situation of a woman "carrying a viable fetus." As Judge Chambers pointed out, plaintiff understood that she was pregnant and that "she had growing within her the beginnings of a unique human life that would result in a birth of the living child if the pregnancy continued without complications or intervention," but that she wanted to be told before agreeing to terminate her pregnancy "that a unique living human being was already in existence within her."

By demanding that a physician advise a pregnant woman that her non-viable embryo "is in all material respects equivalent to a person born and alive," plaintiff would require that the doctor convey "a value judgment not a medical fact," according to Judge Chambers. She noted that the questions of when life begins and whether a woman should terminate a pregnancy "involve moral, philosophical, and religious questions." She further considered that " 'those trained in the respective disciplines of medicine, philosophy, and theology' " have failed to reach a consensus about when life begins, (quoting *Roe, supra,* 410 *U.S.* at 159, 93 *S.Ct.* at 730, 35 *L.Ed.*2d at 181), or " 'about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage,' " (quoting *Planned Parenthood of Se. Pa. v. Casey,* 505 *U.S.* 833, 850, 112 *S.Ct.* 2791, 2806, 120 *L.Ed.*2d 674, 697 (1992)). The law has left the question of whether to abort or go to term with a non-viable embryo, Judge Chambers continued, "for each woman to decide for herself." Judge Chambers concluded that in view of the "current state of the law and the lack of consensus" on the beginning-of-life question—a question implicating more than medical information—a physician is not required to advise a woman that her non-viable embryo "is a living human being" to obtain her informed consent for an abortion. Thus, plaintiff's lack-of-informed consent and emotional distress claims were dismissed.

### D.

In *Acuna v. Turkish,* 384 *N.J.Super.* 395, 403–07, 894 *A.*2d 1208 (App.Div.2006) (*Acuna II* ), the Appellate Division addressed plaintiff's separate appeals challenging the earlier dismissal of the wrongful death claim and the dismissal of her informed consent and emotional distress claims. The panel declined to reconsider its dismissal of the wrongful death claim in *Acuna I,* but determined that the motion judge should not have granted summary judgment on the informed consent and emotional distress claims. *Id.* at 406–07, 894 *A.*2d 1208. The panel did not express agree-

ment with plaintiff's assertion that a physician must disclose to a "pregnant mother that her unborn child is in existence *before* she can make an informed decision on whether" to undergo a termination-of-pregnancy procedure. *Id.* at 403–04, 894 *A.*2d 1208 (internal quotation marks omitted). Nevertheless, the panel found that a jury issue remained concerning whether defendant accurately answered plaintiff's question, "[I]s the baby already there?" *Id.* at 404, 894 *A.*2d 1208 (alteration in original). The panel perceived the sole issue in dispute to be "quite narrow, i.e., what medical information is material and must be disclosed by an obstetrician when advising a patient to terminate a pregnancy and what medical information is material when the patient asks if the 'baby' is already 'there?'" *Id.* at 406, 894 *A.*2d 1208. It concluded "that summary judgment was inappropriate because a reasonable patient" might not consider the information defendant imparted to plaintiff to be "the information necessary to make an informed decision." *Ibid.* On that basis, the panel remanded the issue for trial, allowing both sides to present expert testimony to aid the jury. *Id.* at 406–07, 894 *A.*2d 1208.

We granted defendant's petition for certification seeking review of the Appellate Division's decision reinstating plaintiff's claims related to lack of informed consent, 188 *N.J.* 217, 902 *A.*2d 1234 (2006), but dismissed plaintiff's appeal as of right challenging the dismissal of her wrongful death and survival claims, 189 *N.J.* 420, 915 *A.*2d 1045 (2007). We granted the motions of the American Civil Liberties Union, the American Civil Liberties Union of New Jersey, and the New Jersey Obstetric and Gynecology Society to participate as *amici curiae* in support of defendant's petition.

## II.

### A.

The issue before this Court, as framed by plaintiff in her complaint and throughout the litigation, is whether defendant failed to provide her with material medical information concerning

the nature of the six- to eight-week-old embryo she was carrying and the consequences of her terminating her pregnancy.[9] Plaintiff specifically contends that defendant had a duty "to explain that the procedure [would] terminate the life of a living member of the species Homo sapiens, that is a human being." Plaintiff contends that "there is a critical difference between agreeing to a procedure that would *prevent a human being from coming into existence,* and agreeing to a procedure that *terminates the life of an existing living human being.*" (Emphasis added). She states that she will prove through expert testimony that her six- to eight-week-old embryo was an existing human being. In short, plaintiff submits that defendant was required to tell her that by consenting to an abortion she, in effect, was agreeing to "kill a child of [hers] already in existence."

It is equally important to note what is not at issue. Despite defendant's "don't-be-stupid-it's-only-blood" remark in describing the developmental stage of her embryo, plaintiff understood that without medical intervention or some other superseding circumstance, such as a miscarriage, she would give birth to a child in seven more months. That is, plaintiff did not take defendant's comment to mean that her pregnancy was compromised. Plaintiff, moreover, does not claim that defendant's alleged expression concerning the dangers to her health if she went to term affected her decision to end her pregnancy.[10] As she has repeatedly said, to make an informed decision whether to terminate her pregnancy, she needed to know that her embryo was even at that point an existing human being.

---

[9] The embryonic stage covers the gestation period from conception to about eight weeks. The fetal stage covers the period from about eight weeks to birth. *Magill's Medical Guide* 9 (Tracy Irons–Georges ed., 2d rev. ed.2002).

[10] Plaintiff averred in a supplemental brief submitted to this Court after oral argument that "if she knew that her baby was already there, she would have more carefully scrutinized the information about her health risks, would have sought a second opinion, would have learned that her life was *not* in danger, and would not have consented to the vacuum aspiration."

Defendant and *amici* argue that it would be bad public policy, and probably unconstitutional, under the banner of the law of informed consent, to compel obstetricians to voice plaintiff's non-medical and ideologically-driven viewpoint in the ongoing debate on abortion. They maintain that whether a six- to eight-week-old embryo is an "existing human being" is not a biological fact, but a moral, theological, and highly personal judgment that has sharply divided society, and therefore it would be inappropriate to impose a duty on doctors to take sides in this highly charged debate. Defendant and *amici* also submit that requiring physicians to instruct women seeking an abortion that they will be killing their babies if they go through with terminating their pregnancy places an unconstitutional burden on a woman's right of self-determination. Additionally, they claim that mandating that a physician express a non-medical and value-laden viewpoint conflicting with the physician's own strongly held personal and moral beliefs violates his First Amendment right to the exercise of free—not coerced—speech.

## B.

■ Ultimately, we must decide whether, under the common law duty to obtain informed consent, a physician is required to advise a woman, who is in the sixth to eighth week of pregnancy, that an abortion procedure will kill not just a potential life, but an actual existing human being. We first turn to the law of duty in general, then to a physician's duty to ensure a patient has material information to give informed consent, and last decide whether physicians have a legal duty to give the instructions proposed by plaintiff.

■ A duty is an obligation imposed by law requiring one party "to conform to a particular standard of conduct toward another." *Prosser & Keeton on Torts: Lawyer's Edition* § 53, at 356 (W. Page Keeton ed., 5th ed.1984). The recognition or establishment of a legal duty in tort law is generally a matter for a court to decide. *Clohesy v. Food Circus Supermarkets,* 149 *N.J.*

496, 502, 694 *A*.2d 1017 (1997). One scholarly treatise has put the issue in quite simple, if not specific, terms: "No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists." *Prosser, supra*, at 359. Central to the determination of whether a duty does or should exist is a "value judgment, based on an analysis of public policy," *Kelly v. Gwinnell*, 96 *N.J.* 538, 544, 476 *A*.2d 1219 (1984), and notions of fairness, *Hopkins v. Fox & Lazo Realtors*, 132 *N.J.* 426, 439, 625 *A*.2d 1110 (1993). The fairness and public policy considerations involve weighing several factors: " 'the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.' " *Carvalho v. Toll Bros. & Developers*, 143 *N.J.* 565, 573, 675 *A*.2d 209 (1996) (quoting *Hopkins, supra*, 132 *N.J.* at 439, 625 *A*.2d 1110).

In weighing competing public policy concerns, courts must consider the real-life consequences of imposing a duty and cannot be oblivious of the social realities of the day. In short, courts should be reluctant to impose a duty that society is unwilling to accept. Courts also must be conscious of whether the "desirable policy" proposed by a party "is the subject of intense controversy" and therefore likely to be divisive. *Kelly, supra*, 96 *N.J.* at 545, 476 *A*.2d 1219.

## C.

The underlying basis for the doctrine of informed consent is a patient's right of self-determination, the right to intelligently decide whether to choose or decline a particular medical procedure. *See Niemiera v. Schneider*, 114 *N.J.* 550, 562, 555 *A*.2d 1112 (1989); *Schloendorff v. Soc'y of the N.Y. Hosp.*, 211 *N.Y.* 125, 105 *N.E.* 92, 93 (1914) (Cardozo, J.) ("Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent, commits an assault, for which he is liable in damages."), *overruled on other grounds, Bing*

*v. Thunig,* 2 *N.Y.*2d 656, 163 *N.Y.S.*2d 3, 143 *N.E.*2d 3 (1957). The informed consent doctrine has evolved from a concept originally sounding in battery to a firmly established principle of negligence involving the duty of care a doctor owes his patient. *Howard v. Univ. of Med. & Dentistry of N.J.,* 172 *N.J.* 537, 546–47, 800 *A.*2d 73 (2002).

▮▮▮▮ It is now settled that a physician has a legal duty to disclose to the patient all medical information that a reasonably prudent patient would find material before deciding whether to undergo a medical procedure. *Largey v. Rothman,* 110 *N.J.* 204, 211–12, 540 *A.*2d 504 (1988). The standard focuses on what a *reasonable* patient needs to know—that is, what a *reasonable* patient would likely find significant given the risks—to make an informed decision in foregoing or assenting to a medical procedure. *Howard, supra,* 172 *N.J.* at 547, 800 *A.*2d 73; *see also Matthies v. Mastromonaco,* 160 *N.J.* 26, 36, 733 *A.*2d 456 (1999) ("The standard obligates the physician to disclose only that information material to a reasonable patient's informed decision."). Generally, the physician is required to inform the patient of the available medical options, the risks associated with those options, and the nature of the intended procedure. *Howard, supra,* 172 *N.J.* at 548, 800 *A.*2d 73; *Largey, supra,* 110 *N.J.* at 208, 540 *A.*2d 504.

▮▮▮ A plaintiff filing a negligence action predicated on lack of informed consent, such as in this case, must demonstrate that a physician withheld *medical information* that a reasonably prudent pregnant woman in like circumstances would have considered material before consenting to a termination of pregnancy. *Howard, supra,* 172 *N.J.* at 548, 800 *A.*2d 73 (stating that "patient must prove that the doctor withheld pertinent medical information concerning the risks of the procedure"); *Blazoski v. Cook,* 346 *N.J.Super.* 256, 270, 787 *A.*2d 910 (App.Div.2002) ("Actions for informed consent are limited to the nondisclosure of medical information."); *see also Model Jury Charge (Civil)* § 5.36(C) (Mar.2002) ("The doctor has a duty to explain, in words the patient

can understand, all material medical information and risks."). *See generally* American Medical Association, *Code of Medical Ethics: Current Opinions with Annotations,* Opinion 8.08 (1981) ("The physician's obligation is to present the medical facts accurately to the patient. . . .").

### D.

▮ Plaintiff is prepared to present expert testimony to establish, as a biological fact, that her embryo was "an existing human being"—"a member of the species Homo sapiens"—at the time of the abortion. Defendant, however, can present expert witnesses who will dispute the point and who will assert that plaintiff's characterization of the embryo as a living human being is a moral, theological, or ideological judgment, not a scientific or biological one. Clearly, there is no consensus in the medical community or society supporting plaintiff's position that a six- to eight-week-old embryo is, as a matter of biological fact—as opposed to a moral, theological, or philosophical judgment—"a complete, separate, unique and irreplaceable human being" or that terminating an early pregnancy involves "actually killing an existing human being."

The instructions that plaintiff would have us mandate obstetricians to give are certainly not the medical professional norm within this State, as noted by *amicus* the New Jersey Obstetric and Gynecology Society. Plaintiff has not pointed out whether even a small minority of physicians currently give such instructions. Plaintiff has not directed us to any jurisdiction or any court that has found a common law duty requiring doctors to tell their pregnant patients that aborting an embryo is the killing of an existing human being—an instruction suggesting that both the doctor and patient would be complicit in committing the equivalent of murder.

▮ Plaintiff cannot find support for creating the legal duty she seeks to impose on doctors in either this State's law or federal law. For example, in construing New Jersey's Wrongful Death

Act, this Court concluded that the Legislature did not intend to include a fetus within the definition of a "person" covered by the Act. *Giardina, supra,* 111 *N.J.* at 420–21, 428, 545 *A.*2d 139. Accordingly, the "Act does not permit recovery attributable to the wrongful death of an infant before birth." *Id.* at 413, 545 *A.*2d 139.

Additionally, as the *Giardina* Court observed, in enacting the New Jersey Code of Criminal Justice, "the Legislature considered and rejected the opportunity to classify a fetus as a 'person'" under our current homicide statutes. *Id.* at 422, 545 *A.*2d 139 (citing 2 *Final Report of the New Jersey Criminal Law Revision Commission: Commentary* 150 (1971)). The Final Report noted "that at common-law homicide could be committed only against a 'human being' and that [a human being] did not include a fetus." *Ibid; see also State in the Interest of A.W.S.,* 182 *N.J.Super.* 278, 280, 440 *A.*2d 1144 (App.Div.1981) (concluding that homicide statutes do not apply to fetal death based on review of legislative history and common law).

The United States Supreme Court in *Roe, supra,* eschewed answering the "difficult question of when life begins," stating that "[w]hen those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus, the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer." 410 *U.S.* at 159, 93 *S.Ct.* at 730, 35 *L.Ed.*2d at 181. In *Casey, supra,* the United States Supreme Court repeatedly refers, when speaking of a fetus or embryo, to the State's "interest in potential life," and scrupulously avoids describing either a fetus or an embryo as an existing human being. 505 *U.S.* at 875–76, 112 *S.Ct.* at 2820, 120 *L.Ed.*2d at 714; *see also Gonzales v. Carhart,* 550 *U.S.* ——, 127 *S.Ct.* 1610, 1626, 167 *L.Ed.*2d 480, 502 (2007) (noting that *Casey* recognized importance of "State's interest in potential life"). In *Casey, supra,* the Court held that a state could not enact a regulation placing an "undue burden" on "a woman seeking an abortion of a nonviable fetus." 505 *U.S.* at 877, 112 *S.Ct.* at 2820,

120 *L.Ed.*2d at 714–15. The Court also recognized that, in certain circumstances, a physician might have a First Amendment right to be free from government-compelled speech. *Id.* at 884, 112 *S.Ct.* at 2824, 120 *L.Ed.*2d at 719; *see also Wooley v. Maynard,* 430 *U.S.* 705, 714, 97 *S.Ct.* 1428, 1435, 51 *L.Ed.*2d 752, 762 (1977) (stating that "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all").

It also bears mentioning that a panel of the United States Court of Appeals for the Eighth Circuit upheld a United States District Court's preliminary injunction of a South Dakota statute mandating that a doctor disclose to a patient seeking an abortion information similar to the "biological facts" that plaintiff urges that we include in our common law doctrine of informed consent. *Planned Parenthood Minn. v. Rounds,* 467 *F.*3d 716, 719 (8th Cir.2006), *vacated for rehearing en banc as stated in,* 213 *Fed.Appx.* 508 (8th Cir.2007). The South Dakota statute requires that a physician, before performing an abortion and as a precondition to informed consent, advise the patient that "the abortion will terminate the life of a whole, separate, unique, living human being" and that "by having an abortion, her existing relationship and her existing constitutional rights with regards to that relationship will be terminated." *S.D. Codified Laws* § 34–23A–10.1(1)(b), (d). The statute defines "human being" as an "individual living member of the species of Homo sapiens." *S.D. Codified Laws* § 34–23A–1(4). The panel was unaware of any federal appellate court having reviewed similar disclosure requirements. *Rounds, supra,* 467 *F.*3d at 726. A majority of the panel upheld the district court's preliminary injunction because the compelled disclosures "could be found to violate both the First Amendment rights of physicians and the due process rights of women seeking abortion." *Id.* at 727. The panel's decision has been vacated and the matter will be determined *en banc.*

*Rounds,* of course, addresses a statute enacted by the democratically elected representatives of a state whereas plaintiff is

urging this Court to adopt through its common law the informed consent provisions of that highly controversial statute. Clearly, the compelled disclosure required by the South Dakota Legislature is pushing the doctrine of informed consent to the edge of a new constitutional fault line. *See* Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech,* 2007 *U. Ill. L.Rev.* 939, 956–60 (2007) (noting that to compel physicians to tell pregnant women that embryo or fetus is "human being" would "appear to compel a physician to proclaim 'adherence to an ideological point of view he finds unacceptable,' and in that way to justify rigorous and almost certainly fatal First Amendment scrutiny").

We need not reach the constitutional arguments raised by defendants and *amici* who claim that it is both an undue burden on a woman's right of self-determination and a violation of a physician's First Amendment free speech right to compel a physician to advise a pregnant woman that an embryo is an existing human being and that an abortion is tantamount to killing a child. We do not resolve those arguments because we cannot find that New Jersey's common law imposes a legal duty on a physician to give the instructions sought by plaintiff. In light of our judicial precedents, we will not place a duty on doctors when there is no consensus in the medical community or among the public supporting plaintiff's assertions.

On the profound issue of when life begins, this Court cannot drive public policy in one particular direction by the engine of the common law when the opposing sides, which represent so many of our citizens, are arrayed along a deep societal and philosophical divide. We are not unmindful of the raging debate that has roiled the nation and of the sincerely and passionately held beliefs by those on opposite sides of the debate. We are sympathetic to the deep pain plaintiff has suffered in the aftermath of the termination of her pregnancy. However, the common law doctrine of informed consent requires doctors to provide their pregnant patients seeking an abortion *only* with material medical information, including

gestational stage and medical risks involved in the procedure. Under that doctrine of informed consent, the knowledge that plaintiff sought from defendant cannot be compelled from a doctor who may have a different scientific, moral, or philosophical viewpoint on the issue of when life begins. Therefore, we do not find that the common law commands a physician to inform a pregnant patient that an embryo is an existing, living human being and that an abortion results in the killing of a family member.

## III.

We have considered plaintiff's argument as she has presented it to us both in her briefs and oral argument to this Court. Plaintiff has articulated one basic legal ground underpinning her lack-of-informed-consent claim—defendant's failure to disclose that her embryo was an existing human being. As we have concluded, defendant had no legal duty to make such a disclosure.

Because there are no material issues of fact in dispute and defendant is entitled to judgment as a matter of law, we conclude that the Appellate Division erred in reversing the motion judge's order granting summary judgment in defendant's favor. We therefore reinstate the order dismissing plaintiff's lack-of-informed-consent and emotional distress claims, which were the only remaining claims in this case.

Justice HOENS did not participate.

*For reversal and reinstatement*—Justices LONG, LaVECCHIA, ALBIN, WALLACE and RIVERA-SOTO—5.

*Opposed*—None.