991 A.2d 216

HERMES REYES AND LEONOR REYES, PLAINTIFFS–APPELLANTS, v. HARRY C. EGNER, HOLLY EGNER, AND PRUDENTIAL FOX & ROACH REALTORS, DEFENDANTS–RESPONDENTS, AND HARRY C. EGNER AND HOLLY EGNER, DEFENDANTS/THIRD–PARTY PLAINTIFFS, AND COLUMBIA REYES, THIRD–PARTY DEFENDANT/FOURTH–PARTY PLAINTIFF, v. PRUDENTIAL FOX & ROACH REALTORS, FOURTH–PARTY DEFENDANT.

Argued October 27, 2009—Decided April 8, 2010.

LaVecchia, J., filed concurring opinion in which Rabner, C.J., and Rivera-Soto, J., joined.

Albin, J., filed dissenting opinion in which Long and Wallace, JJ., joined.

*John J. Novak* argued the cause for appellants (*Mr. Novak,* attorney; *Deborah A. Plaia,* on the briefs).

*Michael T. Kearns* argued the cause for respondent Prudential Fox & Roach Realtors (*Hoagland, Longo, Moran, Dunst & Doukas,* attorneys; *Mr. Kearns* and *Dawn P. Marino,* on the briefs).

*Barry S. Goodman* argued the cause for amicus curiae New Jersey Association of Realtors (*Greenbaum, Rowe, Smith & Davis,* attorneys; *Mr. Goodman, Jamie A. Yonks,* and *Steven B. Gladis,* on the brief).

*William S. Bloom* submitted a letter in lieu of brief on behalf of respondents Harry C. Egner and Holly Egner (*Methfessel & Werbel,* attorneys).

PER CURIAM.

The members of the Supreme Court being equally divided, the judgment of the Appellate Division is affirmed.

JUSTICE LaVECCHIA, concurring.

In *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 448, 625 *A.*2d 1110 (1993), we recognized the existence of a duty of care between a real estate agent conducting an open house to attract potential homebuyers and a member of the public who attended that open house. Recognition of that duty of care was intended to ensure the safety of the visitors to the open house tour, limited to alerting open-house attendees "only to defects that are reasonably discoverable through an ordinary inspection of the home undertaken for purposes of its potential sale." *Ibid.* In the instant matter, the Appellate Division determined that the *Hopkins* duty of care did not extend to the short-term lease of a summer rental facilitated through the services of a real estate agent. *Reyes v. Egner,* 404 *N.J.Super.* 433, 466–67, 962 *A.*2d 542 (App.Div.2009). We issued a limited grant of certification to review that determination, 199 *N.J.* 130, 970 *A.*2d 1047 (2009), and now an evenly divided Court affirms the judgment of the Appellate Division that granted summary judgment to the agent. I, and the justices joining this concurrence, would affirm the judgment of the Appellate Division, substantially for the reasons expressed in the thoughtful opinion by Judge Sabatino, and briefly add the following to amplify why we decline to embrace, on these facts, the extension of the *Hopkins* duty of care that our dissenting colleagues would apply.

## I.

Initially, we note, as did the Appellate Division, that plaintiffs [1] must obtain an extension of the duty of care that was announced in *Hopkins* in order to succeed in their action against the real estate agent in this matter. As *Hopkins* arose in the specific context of an open house conducted in connection with the sale of real property, to recognize a similar duty where a short-term tenant already has taken occupancy of a rental property plainly requires an extension of *Hopkins*. Our disinclination to adopt such an extension in this case arises not from a conviction that *Hopkins* must be limited strictly to the factual context of an open house to sell real property, as we need make no such limiting determination in order to resolve this case. Rather, our affirmance of the grant of summary judgment to the real estate agent hinges on the specific facts presented in this matter, the most central of which is that the Reyes family resided in the summer home for nine days before the unfortunate injury to their family member occurred.

Our decision to extend a duty of care in *Hopkins* was based on the application of a fairness inquiry that weighed and balanced four factors: (1) the nature of the parties' relationship; (2) the nature and foreseeability of the risk; (3) the existence of an opportunity to inspect and to warn; and (4) the public policy underlying the imposition of the duty. *Hopkins, supra,* 132 *N.J.* at 439–45, 625 *A.*2d 1110 (citing *Goldberg v. Hous. Auth. of the*

---

[1] In this opinion, we use "plaintiffs" to refer collectively to Hermes Reyes, who died during the pendency of these proceedings, and his wife, Leonor Reyes, who has asserted a per quod claim based on his injuries, with reference to their cause of action against Prudential Fox & Roach Realtors. Notwithstanding the Appellate Division's affirmance of the award of summary judgment in favor of Prudential, the panel's decision expressly permitted the plaintiffs' cause of action against the homeowners, Harry C. Egner and Holly Egner, to proceed. *Reyes v. Egner,* 404 *N.J.Super.* 433, 462, 962 *A.*2d 542 (App.Div.2009). This opinion addresses only plaintiffs' cause of action against Prudential and is not intended to address or limit any other viable cause of action that may exist as between any party involved in this case.

*City of Newark,* 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962)); *see Rogers v. Bree,* 329 *N.J.Super.* 197, 201, 747 *A.*2d 299 (App.Div.2000) (synthesizing four factors analyzed in *Hopkins*). It is unnecessary to engage in a full analysis of each of those considerations, for there is a plain and decisive difference between the facts in *Hopkins* and those in the present case relating to the third factor: the opportunity to inspect. The visual inspection by a realtor discussed in *Hopkins*, which is done for the purpose of ensuring the safety of visitors attending a realtor's open house tour of real property listed for sale, stands in marked contrast to the intimate knowledge of a property that an occupant acquires from actually residing in it.

Our holding in *Hopkins* did not suggest an intent to require that a realtor provide an ongoing guarantee of a property's safety, nor was it designed to protect occupants of a property from personal responsibility for awareness of their surroundings and the dangers inherent in those surroundings. Rather, *Hopkins* established the proposition that realtors owe a duty of care to protect invited visitors to a marketed piece of property from physical conditions that the nature and duration of their visit might not afford them an opportunity to recognize for themselves.[2] *See Hopkins, supra,* 132 *N.J.* at 444–45, 625 *A.*2d 1110. As noted, the Reyes family lived in the shore rental home for more than a week before the injury-causing accident occurred. A nine-day

_____

[2] We note that the licensing body for real estate agents, the New Jersey Real Estate Commission, has promulgated regulatory requirements recognizing a realtor's obligation to engage in a "reasonable effort to ascertain all material information concerning the physical condition of every property for which he or she accepts an agency or which he or she is retained to market...." *N.J.A.C.* 11:5–6.4(b). That "reasonable effort" must include, at least, "[a] visual inspection of the property to determine if there are any readily observable physical conditions affecting the property." *N.J.A.C.* 11:5–6.4(b)(1)(ii). Although we are uncertain of the extent of the duty that the Commission means to impose by that regulation, we are satisfied that that regulatory duty does not extend to the imposition of liability in the scenario presented in this matter, where a tenant has, for nine consecutive days, been in possession of and in residence at the rental property.

actual occupancy offered ample opportunity to the occupants to inspect and discern physical defects in the property. The facts of this case simply do not compel an extension of the *Hopkins* duty of care to plaintiffs' cause of action.

Finally, we take issue with the suggestion of our dissenting colleagues that an extension of the Hopkins duty to inspect under the circumstances presented would not impair the short-term rental market in New Jersey. *See post* at 432–33, 991 *A.*2d at 224–25. To the contrary, we cannot help but conclude that so broad an extension of *Hopkins*, with the expected increase in insurance premiums for real estate agencies that would follow, would impact the cost of short-term rentals. We cannot imagine that those increases would be borne by anyone other than the renters—the families, friends and individuals—who vacation in New Jersey each year. On the facts presented, we find no compelling reason to subject the rental industry to the chilling effect of such an extension of the *Hopkins* duty of care.

## II.

In sum, we would affirm the grant of summary judgment to the real estate agent, substantially for the reasons stated by the Appellate Division and as augmented in this opinion.

Chief Justice RABNER and Justice RIVERA–SOTO join in this opinion.

Justice ALBIN, dissenting.

On a late summer's day, seventy-two year old Hermes Reyes opened the sliding glass door separating the master bedroom from the outside deck of the summer house his daughter had rented. Immediately outside the bedroom's sliding glass door was a seven-inch drop to an intermediate step followed by a six-and-one-half inch drop to the deck. There was no warning of a drop from the bedroom to the deck; the color and grain of the wood of the deck and step suggested one continuous surface. Unaware of the drop,

Reyes lost his balance as he stepped outside, tumbling toward the deck's stairs, which had no handrail. He fell down the deck's five steps and onto the ground, suffering severe and permanent injuries.

In *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 625 *A.*2d 1110 (1993), this Court determined that a real estate broker who held an open house for potential buyers had a duty to warn of any reasonably discoverable dangerous conditions in the home. In *Hopkins,* similar to the facts here, the allegedly dangerous condition that caused injury to the visitor was an inconspicuous step down separating two rooms in a house. In this case, however, because of a three-Justice to three-Justice stalemate, the judgment of the Appellate Division is affirmed, placing no duty on a real estate broker to warn of reasonably discoverable dangerous conditions in a short-term rental.

The discordant results in these two cases are difficult to reconcile. The real estate broker, when holding an open house, has a duty to warn of dangerous conditions, even if receiving no financial benefit from the visitor, but has no corresponding duty to a short-term renter from whom a financial profit is made. Our tort jurisprudence now demands that a broker at an open house say, "buyer, watch your step," but allows a broker with full knowledge of a dangerous condition to remain mute to a short-term lessee, and by his silence say, "renter be damned."

This cannot be the result the Court had in mind in *Hopkins.* The failure to place on brokers a reasonable duty of care in the present case is a sharp departure from our evolving common law standards. Tort law does more than allocate costs among responsible tortfeasors; it also is aimed at reducing the number of preventable accidents. Simple economics, moreover, suggests that when imposing a duty of care results in fewer accidents, there will be fewer insurance payouts, which ultimately should lead to an overall reduction in insurance premiums. In short, imposing a duty of care should have no adverse financial impact on the short-term rental market.

The Appellate Division deferred to this Court to determine whether to impose a duty on brokers to warn the unwary of dangerous conditions in short-term rentals, as we did in *Hopkins* for open houses. Sadly, my concurring colleagues today take a pass on the Appellate Division's invitation to refine our developing common law. Because of this lost opportunity, brokers will have no legal incentive to protect short-term renters from the type of avoidable tragedy that occurred in this case.

## I.

Plaintiff Hermes Reyes filed a civil action in the Middlesex County Superior Court in 2005, alleging that he suffered serious personal injuries as a result of a dangerous condition on rental property owned by defendants Harry and Holly Egner. The property was leased by defendant Prudential Fox & Roach Realtors, the broker, to Reyes's daughter, Columbia.[1] Reyes claims that the Egners and Prudential had a duty to give fair warning of the reasonably discoverable dangerous condition that caused his injuries.[2] Because the trial court entered judgment against Reyes, dismissing his complaint against Prudential on the basis that the broker had no duty to warn of a purportedly dangerous condition on the rental property, at this stage we must view the evidence in the light most favorable to Reyes.[3]

---

[1] The Egners filed a third-party complaint against Columbia, who in turn filed a fourth-party complaint against Prudential. The complaint against Columbia was later dismissed.

[2] Reyes's wife, Leonor, filed a consortium claim against defendants in the same action. Reyes died on March 23, 2009.

[3] The trial court clearly applied the wrong standard in granting summary judgment in favor of Prudential. Reyes moved for summary judgment on the basis that Prudential owed him a duty of care. It would have been entirely proper for the trial court to deny Reyes's motion, viewing the facts in the light most favorable to Prudential. Instead the court dismissed Reyes's claims. In effect, the court granted summary judgment for Prudential, which was not the moving party, while viewing the facts in the light most favorable to Prudential.

## A.

The summer rental home in Stone Harbor, New Jersey, where Reyes suffered his injuries, was sold to the Egners on February 14, 2003. Prudential was the listing agent on the property. On the purchase date, a Prudential agent conducted a walk-through with the Egners, and the Egners authorized Prudential, in a written contract, to act as their "agent to complete rental agreements and execute leases on [their] behalf." Under the contract, Prudential also was given authority "to make necessary emergency repairs to [the] property and/or appliances." Before listing the property, another Prudential agent visited the house to verify information about its amenities. In exchange for Prudential's services, which included listing and advertising the property, the Egners agreed to pay a twelve-percent commission on any signed lease. Prudential advertised available summer properties to potential renters on its website, on local radio, and in the *Philadelphia Inquirer*.

Prudential mailed a brochure listing available summer rentals to Columbia Reyes. In the spring of 2003, she called Prudential and had numerous conversations with one of its agents about renting a summer home. Ultimately, she decided to rent the Egners' house for two weeks, beginning August 23, 2003.

Acting as the Egners' agent, Prudential sent Columbia a lease agreement, which she signed and returned with a down payment. Under the terms of the contract, Columbia agreed to pay $4,050, which included a $500 returnable security deposit, for the two-week rental. Columbia did not visit the Stone Harbor property until the start of the rental period.

The rental property featured four bedrooms, including a master bedroom with a sliding glass door that led to a small wood deck

---

*See R.* 4:46–2(c) ("The judgment ... shall be rendered forthwith if ... the *moving party* is entitled to a judgment or order as a matter of law." (emphasis added)); *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.2d* 146 (1995).

overlooking the backyard. To get to the deck through the master bedroom's sliding glass door, one would have to step down seven inches onto a wooden "intermediate platform," and then step down another six-and-one-half inches onto the deck itself. The deck was connected to the backyard by five steps.

There was no sign or visual cue cautioning a guest walking through the sliding glass door that the deck was not on the same level as the bedroom. As the trial court noted, "if you look at the picture out the bedroom door, it appears that you're walking onto a single space.... It could be an optical illusion." In short, a guest would have no warning of the drop once he stepped through the bedroom's sliding glass door onto the deck.

Reyes arrived with Columbia and other family members at the start of the lease period. Reyes and his wife stayed in the master bedroom. On the ninth day of their vacation, Reyes opened the bedroom's sliding glass door for the first time, expecting to step onto a level deck. Unaware of the drop, Reyes lost his balance and stumbled headlong towards the deck's stairs, which had no handrail. He then fell down the flight of stairs leading to the backyard.

Reyes was transported to a hospital where he remained for the next five days. After his discharge, he spent five-and-one-half weeks receiving treatment at a rehabilitation facility. He claimed that he suffered severe and permanent injuries to his back.

## B.

The trial court granted judgment in favor of Prudential, finding that Prudential had no duty to inspect the home it rented to the Reyes family and no duty to warn the family of reasonably discoverable dangerous conditions on the property. The court distinguished this case from *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 625 *A.*2d 1110 (1993), on the basis that an open house— the *Hopkins* scenario—is of more limited duration than a two-week rental period. The court also determined that imposing a

duty of care on Prudential would be unjust because of the seemingly nominal services it provided and fee it received.

The Appellate Division affirmed the trial court's dismissal of Reyes's claim against Prudential.[4] *Reyes v. Egner*, 404 *N.J.Super.* 433, 467, 962 *A.*2d 542 (App.Div.2009). The appellate panel construed *Hopkins* as imposing a broker's duty to warn of reasonably discoverable dangerous conditions only to potential home buyers visiting during an open house. *Id.* at 464, 962 *A.*2d 542. In declining to impose a duty on Prudential, the panel nevertheless noted that Reyes had "raised several policy arguments for why a broker should be liable in tort for failing to perform an adequate inspection of rental property." *Id.* at 466–67, 962 *A.*2d 542 (footnote omitted). The panel "reserve[d]" to this Court whether the duty imposed on brokers in *Hopkins* should be extended for the protection of those enjoying short-term rentals. *Id.* at 467, 962 *A.*2d 542.

We granted Reyes's petition for certification. 199 *N.J.* 130, 970 *A.*2d 1047 (2009). I believe that the facts here provide as compelling a case as *Hopkins* for imposing on brokers a duty to warn short-term renters of reasonably discoverable dangerous conditions.

## II.

### A.

In *Hopkins*, *supra*, the plaintiff accompanied her son and daughter-in-law to an open house hosted by the broker, defendant Fox & Lazo Realtors. 132 *N.J.* at 432, 625 *A.*2d 1110. The broker's representative permitted the three to tour the premises on their own. *Ibid.* At some point, plaintiff walked down a

---

[4] The trial court had entered summary judgment in favor of the Egners. The Appellate Division, however, reversed and remanded for trial on the issue of the Egners' liability as homeowners. The discussion in this opinion is limited to Reyes's case against Prudential.

hallway unaware that it led to a step-down foyer. *Ibid.* The hallway and the foyer were covered with the same vinyl pattern, effectively camouflaging the approaching step. *Ibid.* Plaintiff lost her footing as she stepped into the foyer, fracturing her ankle. *Ibid.*

In *Hopkins*, we concluded that a broker owed a duty to warn a *potential* purchaser and his guests, invited to an open house, "of any dangerous conditions that the broker might reasonably discover while examining a residence in preparation for an open house." *Id.* at 445, 625 *A.*2d 1110. "The broker is not responsible for latent defects that are hidden and of which the broker has no actual knowledge." *Id.* at 448–49, 625 *A.*2d 1110. We suggested that, before conducting an open house, the broker's inspection

should consist of an examination of the premises to ascertain the obvious physical characteristics that are material to its saleability, as well as those features that a prospective purchaser would routinely examine during a "walk through" of the premises. Included are such features relating to the safety, not only of the customer as a potential buyer and ultimate owner or occupier of the home, but also of visitors who are present on the property on the invitation of the broker. That inspection would impose on the broker the duty to warn of any such discoverable physical features or conditions of the property that pose a hazard or danger to such visitors.

[*Id.* at 444–45, 625 *A.*2d 1110.]

We did not "view the imposition of a duty to undertake a reasonable broker's inspection ... and to give adequate warnings with respect to hazards readily discoverable through such an inspection, to be an unreasonable economic strain on a broker's livelihood." *Id.* at 446, 625 *A.*2d 1110. We believed that it was "reasonable and fair" for the broker to bear at least some of the costs related to the injury suffered by the plaintiff given the economic benefits the broker received from conducting an open house. *Ibid.* We noted that the broker would "retain a right of either contribution or indemnification from the homeowner," emphasizing that the homeowner "remains primarily liable for the safety of all invitees on the property, including open-house visitors." *Id.* at 447, 625 *A.*2d 1110. Therefore, the broker would not be "solely responsible for the increased costs" related to the

imposition of a duty to warn unsuspecting visitors at an open house of reasonably discoverable dangers. *Id.* at 446–47, 625 *A.*2d 1110.

## B.

The logic and commonsense of *Hopkins* lead to imposing a duty on brokers to warn of reasonably discoverable dangerous conditions in the homes they are leasing to short-term renters. In deciding whether to impose a duty of care, our Court has looked to four factors: (1) "the relationship of the parties"; (2) "the nature of the attendant risk"; (3) "the opportunity and ability to exercise care"; and (4) "the public interest in the proposed solution." *Id.* at 439, 625 *A.*2d 1110; *see also Acuna v. Turkish,* 192 *N.J.* 399, 414, 930 *A.*2d 416 (2007); *Carvalho v. Toll Bros. & Developers,* 143 *N.J.* 565, 573, 675 *A.*2d 209 (1996).

First, in this case, as the homeowners' agent, Prudential had a "cognizable relationship" with the Reyes family to whom it leased the Stone Harbor property. *See Hopkins, supra,* 132 *N.J.* at 440, 625 *A.*2d 1110. Prudential advertised the property, forwarded a brochure to Columbia, and engaged in numerous conversations with her with the intent of renting property to her and her family. Prudential succeeded in leasing the Stone Harbor house to the Reyes family for two weeks in the summer and mailed to Columbia the contract governing the rental.

In this case, Prudential received a direct economic benefit from the Reyes family, a twelve-percent commission on the lease, as well as a commission on every other lease to every other family renting the Stone Harbor house. In contrast, the broker in *Hopkins* received no tangible benefit from the injured plaintiff (or her son and daughter-in-law) who was merely visiting the realtor's open house. Here, Prudential was operating in a much larger market and, evidently, leasing many other short-term rentals. Accordingly, the financial benefits from summer rentals to Prudential, and other similarly-situated brokers, are hardly nominal.

Second, "the nature of the attendant risk" was significant. A camouflaged step connecting the master bedroom to the outside deck of the Stone Harbor property led to a foreseeable injury—in this case, a seventy-two-year-old man losing his balance and then tumbling down a flight of stairs that had no handrail. In short, the risk here was that a house guest would suffer grievous and severe injuries from a dangerous condition of the property.

Third, Prudential had "the opportunity and ability to exercise care." A Prudential agent did a walk-through of the Stone Harbor property at the time the Egners purchased the house. Additionally, after the Egners authorized Prudential "to complete rental agreements and execute leases on [their] behalf," Prudential followed its practice of having an agent visit the house to detail the amenities available to a renter. Surveying the amenities must mean more than counting tea cups in a cupboard; it must require some form of visual inspection of the premises. Prudential agents had the opportunity to notice a non-latent, reasonably discoverable dangerous condition on the Stone Harbor property.

The New Jersey Administrative Code also mandates that licensed New Jersey real estate agents "make [a] reasonable effort to ascertain all material information concerning the physical condition of every property for which he or she accepts an agency." *N.J.A.C.* 11:5–6.4(b). The "reasonable effort" contemplated by the regulation includes a "visual inspection of the property to determine if there are any readily observable physical conditions affecting the property." *N.J.A.C.* 11:5–6.4(b)(1)(ii). Clearly, post-*Hopkins*, brokers were on notice that a camouflaged or concealed step down separating one room from another was a potentially dangerous condition. A duty to warn is an appropriate burden to impose on Prudential because, in its role as broker, Prudential—not the homeowners—was communicating with the Reyes family. Finally, although the parties may disagree about the kind of inspection *N.J.A.C.* 11:5–6.4(b) demands, that issue might be informed by expert testimony on what is reasonable and customary in the

broker/realty industry. *See Hopkins, supra,* 132 *N.J.* at 444, 625 *A.*2d 1110.

The last factor is "the public interest in the proposed solution." The purpose of our tort system is not "simply to provide legal redress to an injured party," but to give incentives to discourage negligent conduct. *Hopkins, supra,* 132 *N.J.* at 448, 625 *A.*2d 1110. Thus, one of the central objectives of tort law is to prevent accidents. Imposing a duty to warn of a reasonably discoverable dangerous condition—the type of condition that would be apparent to a broker after conducting an inspection under *N.J.A.C.* 11:5-6.4(b)(1)(ii)—would give brokers an "incentive[ ] to minimize risks of harm" to unsuspecting short-term renters. *Ibid.* The public has a strong interest in reducing the number of accidents that occur by ensuring that those who know or should know of a dangerous condition give notice to the unwary. When the cost of preventing an accident by conducting a reasonable inspection is less than the cost of paying for one, economics will impel brokers to give the necessary warnings. *See id.* at 447, 625 *A.*2d 1110; *cf.* George Lefcoe, *Property Condition Disclosure Forms: How the Real Estate Industry Eased the Transition from Caveat Emptor to Seller Tell All,* 39 *Real Prop. Prob. & Tr. J.* 193, 213–16 (2004) (discussing how brokers, as result of expanded tort liability, became "driving force" behind promoting seller disclosures of property defects, which reduce post-sale suits against brokers). This Court has "recognized the salutary effect of shifting the risk of loss" to those who are in a position to prevent harm arising from a dangerous condition. *Hopkins, supra,* 132 *N.J.* at 447, 625 *A.*2d 1110.

Imposing a duty on brokers to warn of reasonably discoverable dangerous conditions in no way weakens the primary duty that homeowners, who lease their properties, must bear for not warning of or repairing dangerous conditions that threaten short-term renters. *See Reyes, supra,* 404 *N.J.Super.* at 452, 460–61, 962 *A.*2d 542. Because homeowners are not excused from liability for reasonably discoverable dangerous conditions that may cause inju-

ry to an invitee, principles of comparative negligence would apply, and realtors would have a right to contribution or indemnification. *See N.J.S.A.* 2A:15–5.3(e); *N.J.S.A.* 2A:53A–1 to –3; *Hopkins, supra,* 132 *N.J.* at 447, 625 *A.*2d 1110. Moreover, principles of comparative negligence also would limit, and sometimes bar, a recovery against a realtor when a plaintiff fails to exercise reasonable care after becoming aware of a dangerous condition. *See N.J.S.A.* 2A:15–5.1 to 5.3; *see also Berger v. Shapiro,* 30 *N.J.* 89, 99, 152 *A.*2d 20 (1959) ("If the guest is aware of the dangerous condition or by a reasonable use of his faculties would observe it, the host is not liable.").

Imposing a duty on brokers would not increase the number of lawsuits; indeed, the opposite would occur. Some short-term renters will sue homeowners for injuries caused by dangerous conditions of which those renters were not made aware. That is true today, and it will be true tomorrow. The threat of bringing brokers into those cases would only reduce the number of lawsuits. That is so because, in a certain percentage of cases, brokers would make short-term renters aware of reasonably discoverable dangerous conditions, and therefore the accidents would never happen.

Finally, it is unlikely that imposing a duty to inspect and warn would impair the short-term rental market. *See Hopkins, supra,* 132 *N.J.* at 446, 625 *A.*2d 1110 ("Given the economic benefits that inure to the broker ..., to ask the broker to internalize the costs associated with conducting its business is reasonable and fair."). Presumably, realtors already purchase insurance as part of the cost of doing business, and any additional cost would be spread among homeowners who would benefit financially from fewer lawsuits, if the imposition of the duty logically leads to fewer accidents. Indeed, if there were fewer accidents, and fewer lawsuits, one would expect an overall decrease in insurance premiums. *See, e.g.,* David A. Hyman & Charles Silver, *The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?,* 90 *Cornell L.Rev.* 893,

917–20 (2005) (detailing how tort liability and high insurance premiums led anesthesiologists to enact reforms, and "[a]s anesthesia became safer, lawsuits against anesthesiologists became less frequent and liability premiums for anesthesiologists declined significantly"). Any increase in premiums for brokers should be offset by a decrease in premiums for homeowners, resulting in a wash for the short-term rental market.

## III.

Before imposing a duty of care on a party, a court must consider notions of fairness and public policy. *Acuna, supra,* 192 *N.J.* at 414, 930 *A.*2d 416. Here, fairness and public policy dictate that brokers, such as Prudential, bear a duty to inspect and warn residents of short-term rental properties about reasonably discoverable dangerous conditions. Undoubtedly, those unfamiliar with the property will be relying on the skill and knowledge of the realtor who is renting the premises. That plaintiff in this case is the father of the person who signed the rental contract does not relieve the broker of a duty to warn because it is foreseeable that family members and even friends will reside in a short-term rental. A dangerous condition of the property will be no less dangerous to the people whose names are not on the contract. *See generally Carvalho, supra,* 143 *N.J.* at 572–73, 675 *A.*2d 209; *cf. Monaco v. Hartz Mt. Corp.,* 178 *N.J.* 401, 418–19, 840 *A.*2d 822 (2004) (finding commercial landlord owed duty to employee of tenant as invitee, and that, under *Hopkins*'s analysis, "[t]he fairness and justice of recognizing a duty in such circumstances are clear beyond cavil").

As our common law of torts has evolved, we have recognized that fairness and public policy require the imposition of duties of care that earlier did not exist. *See Hopkins, supra,* 132 *N.J.* at 435, 625 *A.*2d 1110 ("Because public policy and social values evolve over time, so does the common law."); *see also Kelly v. Gwinnell,* 96 *N.J.* 538, 556, 476 *A.*2d 1219 (1984) (imposing duty on social hosts not to serve alcohol to visibly intoxicated guests); *Trentacost*

*v. Brussel,* 82 *N.J.* 214, 231, 412 *A.*2d 436 (1980) (imposing duty on landlord "to take reasonable security measures for tenant protection on the premises"); *Henningsen v. Bloomfield Motors, Inc.,* 32 *N.J.* 358, 384, 161 *A.*2d 69 (1960) (abolishing privity requirement in product-liability suits against manufacturers). In his concurring opinion in *Hopkins, supra,* Justice Clifford found that imposing a duty on brokers to warn clients in an open house of a dangerous condition would be " 'no big deal,' . . . just nudg[ing] the law forward an inch or so." 132 *N.J.* at 451, 625 *A.*2d 1110. Likewise, imposing a duty on brokers in the circumstances of this case would be another incremental advance in the law.

Importantly, the New Jersey Association of Realtors, which appeared as amicus curiae on behalf of Prudential, admitted during oral argument before this Court that if a door to the second floor of a house opened into thin air, the broker would have a duty to warn of the danger before the tenant blithely walked through that door to his doom. The Association, which opposes any extension of *Hopkins,* seemingly concedes that an unsuspecting renter must be warned of *some* dangerous conditions. However, if a broker has a duty to warn, the question of whether a condition on the premises is dangerous (or dangerous enough) and whether it is reasonably discoverable by a broker would be a matter for a jury.[5]

My three concurring colleagues who are affirming the Appellate Division's judgment suggest that had Reyes taken his fall on day one of the rental, the broker might have had a duty to warn. My concurring colleagues state that "[a] nine-day actual occupancy offered ample opportunity to the occupants to inspect and discern physical defects in the property." *Ante* at 421–22, 991 *A.*2d at 218. Here, Reyes discovered the defect when, for the first time, he stepped onto the deck and fell down a flight of stairs. Whether

---

[5] It is worth noting that Prudential's own expert report (submitted during the appeal) indicates that licensed realtors have a duty to disclose known defects and "apparent defect[s] (such as a bare wire hanging from a ceiling) in a summer rental unit."

Reyes had "ample opportunity" to discover the defect, or should have known of the defect, has nothing to do with Prudential's duty to warn. Rather, whether Reyes should have discovered the danger implicates the doctrine of comparative negligence, not duty, and therefore would be a question for a jury to determine. If Prudential had a duty to warn, and indeed warned, of reasonably discoverable dangers on day one, presumably there would not have been an accident on day nine. The duty to warn stands apart from whether Reyes stepped onto the defective deck on the first day rather than the ninth day of his vacation.

### IV.

New Jersey's citizens would benefit if brokers warn short-term renters of reasonably discoverable dangerous conditions on the premises. Reducing preventable accidents is in the public interest. Brokers have specialized knowledge and experience in the field of realty and already are required to inspect rental properties. It is not unreasonable to impose on brokers a duty to warn the unwary from whom they are profiting. If they violate that duty, they should be prepared to bear the cost of their negligence. Because the Court is evenly split on whether brokers owe a duty to short-term renters, the ultimate resolution of this issue must await another day.

I would impose a duty on brokers, such as Prudential, to inspect and warn short-term renters of reasonably discoverable dangers on the premises. I therefore respectfully dissent.

Justices LONG and WALLACE join in this opinion.

*For affirmance*—Chief Justice RABNER and Justices LaVECCHIA and RIVERA–SOTO—3.

*For reversal*—Justices LONG, ALBIN and WALLACE—3.